# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 8, 2014        Decided November 14, 2014

No. 13-5368

PRIESTS FOR LIFE, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL.,
APPELLEES

———

Consolidated with 13-5371, 14-5021

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-01261)
(No. 1:13-cv-01441)

———

*Robert J. Muise* argued the cause for appellants/cross-appellees Priests For Life, et al. *Noel J. Francisco* argued the cause for appellants/cross-appellees Roman Catholic Archbishop of Washington, et al. With them on the briefs were *Eric Dreiband* and *David Yerushalmi*.

*Kimberlee Wood Colby* was on the brief for *amici curiae* The Association of Gospel Rescue Missions, et al. in support of cross-appellants/cross-appellees.

*Mark B. Stern*, Attorney, U.S. Department of Justice, argued the cause for appellees/cross-appellants. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, *Beth S. Brinkmann*, Deputy Assistant Attorney General, and *Alisa B. Klein* and *Adam C. Jed*, Attorneys.

*Martha Jane Perkins* was on the brief for *amici curiae* National Health Law Program, et al. in support of appellees/cross-appellants.

*Marcia D. Greenberger* and *Charles E. Davidow* were on the brief for *amici curiae* The National Women's Law Center, et al. in support of appellees/cross-appellants.

*Ayesha N. Khan* was on the brief for *amici curiae* Americans United for Separation of Church and State, et al. in support of appellees/cross-appellants.

Before: ROGERS, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: These consolidated cases present the question whether a regulatory accommodation for religious nonprofit organizations that permits them to opt out of the contraceptive coverage requirement under the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 300gg-13(a)(4), itself imposes an unjustified substantial burden on Plaintiffs' religious exercise in violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.* Plaintiffs' principal claim is that the accommodation does not go far enough. They believe that, even if they opted out, they would still play a role in

facilitating contraceptive coverage. They view the regulation as thereby substantially burdening their religious exercise by involving them in what the Plaintiffs and their faith call "scandal," i.e., leading others to do evil. Plaintiffs claim that the government lacks a compelling interest in requiring them to use the specific accommodation the regulations authorize, making the burden unjustified and unlawful. They contend that RFRA gives them a right to exclude contraceptive coverage from their employees' and students' plans without notice, and requires that the government be enjoined from implementing the contraceptive coverage requirement.

\* \* \*

As a consequence of a period of wage controls after World War II during which employers created new fringe benefits, the majority of people in the United States with health insurance receive it under plans their employers arrange through the private market. Congress chose in the ACA not to displace that basic system. It sought instead to expand the number of Americans insured and to improve and subsidize health insurance coverage, in part by building on the market-based system of employer-sponsored private health insurance already in place. The contraceptive coverage requirement and accommodation operate through that system.

The regulations implementing the ACA and its Women's Health Amendment impose a range of standard requirements on group health plans, including that they cover contraceptive services prescribed by a health care provider without imposing any cost sharing on the patient. The contraceptive coverage requirement derives from the ACA's prioritization of preventive care, and from Congress' recognition that such care has often been modeled on men's health needs and thus left women underinsured. As discussed below, Congress

included the Women's Health Amendment in the ACA to remedy the problem that women were paying significantly more out of pocket for preventive care and thus often failed to seek preventive services, including consultations, prescriptions, and procedures relating to contraception. The medical evidence prompting the contraceptive coverage requirement showed that even minor obstacles to obtaining contraception led to more unplanned and risky pregnancies, with attendant adverse effects on women and their families.

Some employers, including the Catholic nonprofits in this case, oppose contraception on religious grounds. The Catholic Church teaches that contraception violates God's design because the natural and non-sinful purpose of sex is to conceive a child within a marriage: Plaintiff Priests for Life, quoting the Papal Encyclical *Humanae Vitae*, declares that "'any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means'—including contraception and sterilization—is a grave sin." J.A. 49. In the view of the Catholic Church expressed through *Humanae Vitae*, contraception enables the separation of sex from reverence for the sexual partner, the understanding that sex makes children, and the imperative of deep commitment to marriage and family.

The Catholic Church itself is exempt from the contraceptive coverage requirement, but Catholic nonprofits have a long and broad history of service that goes far beyond worship or proselytizing. Nationally, Catholic hospitals, clinics, universities, schools, and social services groups provide many services that are not inherently religious. Catholic-identified nonprofits employ and enroll as students millions of adults, not all of whom are co-religionists or share the Catholic Church's religious opposition to contraception.

Faced with an employer-based health insurance system, forceful impetus to require coverage of contraceptive services, and religious opposition by some employers to contraception, the government sought to accommodate religious objections. As detailed below, the ACA's implementing regulations allow religious nonprofits to opt out of including contraception in the coverage they arrange for their employees and students. The regulations assure, however, that the legally mandated coverage is in place to seamlessly provide contraceptive services to women who want them, for whom they are medically appropriate, and who personally have no objection to using them.

The regulatory opt out works simply: A religious organization that objects on religious grounds to including coverage for contraception in its health plan may so inform either the entity that issues or administers its group health plan or the Department of Health and Human Services. Delivery of the requisite notice extinguishes the religious organization's obligation to contract, arrange, pay, or refer for any coverage that includes contraception. The regulations then require group health plan insurers or administrators to offer separate coverage for contraceptive services directly to insured women who want them, and to inform beneficiaries that the objecting employer has no role in facilitating that coverage.

Plaintiffs, the Roman Catholic Archbishop of Washington and nonprofits affiliated with the Catholic Church, arrange for group health coverage for their employees and students. Plaintiffs oppose the ACA's contraceptive coverage requirement on religious grounds and do not want to provide the requisite contraceptive coverage.

Instead of taking advantage of the accommodation, Plaintiffs filed suit to challenge it as a violation of their religious rights.

Plaintiffs' principal claim arises under RFRA. Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), that the Free Exercise Clause of the First Amendment "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Id.* at 879 (internal quotation marks omitted). Congress sought to reinstate as a statutory matter the pre-*Smith* free exercise standard. Under RFRA, the federal government may not "substantially burden" a person's religious exercise—even where the burden results from a religiously neutral, generally applicable law that is constitutionally valid under *Smith*—unless the imposition of such a burden is the least restrictive means to serve a compelling governmental interest.

The contraceptive coverage opt-out mechanism substantially burdens Plaintiffs' religious exercise, Plaintiffs contend, by failing to extricate them from providing, paying for, or facilitating access to contraception. In particular, they assert that the notice they submit in requesting accommodation is a "trigger" that activates substitute coverage, and that the government will "hijack" their health plans and use them as "conduits" for providing contraceptive coverage to their employees and students. Plaintiffs dispute that the government has any compelling interest in obliging them to give notice of their wish to take advantage of the accommodation. And they argue that the government has failed to show that the notice requirement is the least restrictive means of serving any such interest.

We conclude that the challenged regulations do not impose a substantial burden on Plaintiffs' religious exercise

under RFRA. All Plaintiffs must do to opt out is express what they believe and seek what they want via a letter or two-page form. That bit of paperwork is more straightforward and minimal than many that are staples of nonprofit organizations' compliance with law in the modern administrative state. Religious nonprofits that opt out are excused from playing any role in the provision of contraceptive services, and they remain free to condemn contraception in the clearest terms. The ACA shifts to health insurers and administrators the obligation to pay for and provide contraceptive coverage for insured persons who would otherwise lose it as a result of the religious accommodation.

Even if, as Plaintiffs aver, we must take as dispositive their conviction that the accommodation involves them in providing contraception in a manner that substantially burdens their religious exercise, we would sustain the challenged regulations. A confluence of compelling interests supports maintaining seamless application of contraceptive coverage to insured individuals even as Plaintiffs are excused from providing it. That coverage offers adults and children the benefits of planning for healthy births and avoiding unwanted pregnancy, and it promotes preventive care that is as responsive to women's health needs as it is to men's. The accommodation requires as little as it can from the objectors while still serving the government's compelling interests. Because the regulatory opt-out mechanism is the least restrictive means to serve compelling governmental interests, it is fully consistent with Plaintiffs' rights under RFRA. We also find no merit in Plaintiffs' additional claims under the Constitution and the Administrative Procedure Act.

## I. Background

### A. The ACA & Accommodation

The ACA requires group health plans, including both insured and self-insured employer-based plans, to include minimum coverage for a variety of preventive health services without imposing cost-sharing requirements on the covered beneficiary.[1] 42 U.S.C. § 300gg-13(a); *see also id.* § 300gg-91(a) (defining "group health plan"); 45 C.F.R. § 147.131(c)(2)(ii) (cost-sharing includes copayments, coinsurance, and deductibles). In view of the greater preventive health care costs borne by women, the Women's Health Amendment in the ACA specifically requires coverage for women of "such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(4).

To determine which preventive services should be required, the Health Resources and Services Administration ("HRSA"), a component of HHS, commissioned a study from the independent Institute of Medicine ("IOM" or "Institute"). The Institute is an arm of the National Academy of Sciences established in 1970 to inform health policy with available scientific information. In reliance on the work of the Institute, HRSA established guidelines for women's

---

[1] An employer "self-insures" if it bears the financial risk of paying its employees' health insurance claims (as opposed to contracting with an insurance company to provide coverage and bear the associated financial risk). Many "self-insured" employers hire third-party administrators ("TPAs") to perform administrative functions, such as developing provider networks and processing claims. *See generally* Cong. Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals* 6 (2008).

preventive services that include any "[FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling." Health Resources & Servs. Admin., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines/, *quoted in* 77 Fed. Reg. 8725, 8725 (Feb. 15, 2012).

The three agencies responsible for the ACA's implementation—the Department of Health and Human Services, the Department of Labor, and the Department of the Treasury (collectively, the "Departments")—issued regulations requiring coverage of all preventive services contained in the HRSA guidelines, including contraceptive services. *See* 45 C.F.R. § 147.130(a)(1)(iv) (HHS); 29 C.F.R. § 2590.715-2713(a)(1)(iv) (Labor); 26 C.F.R. § 54.9815-2713(a)(1)(iv) (Treasury). The Departments determined that contraceptives prevent unintended pregnancies and the negative health risks associated with such pregnancies; they "have medical benefits for women who are contraindicated for pregnancy," and they offer "demonstrated preventive health benefits . . . relating to conditions other than pregnancy . . . ." 77 Fed. Reg. at 8,727. Inadequate coverage for women not only fails to protect women's health, but "places women in the workforce at a disadvantage compared to their male co-workers." *Id.* at 8,728. Providing contraceptive coverage within the preventive-care package, the Departments observed, supports the equal ability of women to be "healthy and productive members of the job force." *Id.* Because of the importance of such coverage, and because "[r]esearch . . . shows that cost sharing can be a significant barrier to effective contraception," the Departments included contraceptive coverage among the services to be provided without cost sharing. *Id.*

Objections by religious nonprofits to the use of contraception, and to arranging health insurance for their employees that covers contraceptive services, prompted the Departments to create two avenues for religious organizations to exclude themselves from any obligation to provide such coverage. Those avenues track a longstanding and familiar distinction between houses of worship (e.g., temples, mosques, or churches) and religious nonprofits (e.g., schools, hospitals, or social service agencies with a religious mission or affiliation). First, in order to "respect[] the unique relationship between a house of worship and its employees in ministerial positions," the Departments categorically exempted "religious employers," defined as churches or the exclusively religious activities of any religious order, from the contraceptive coverage requirement.[2] 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011); *see* 45 C.F.R. § 147.131(a). Second, the Departments created a mechanism for nonprofit "eligible organizations," i.e., groups that are not houses of worship but nonetheless present themselves as having a religious character, to opt out of having to "contract, arrange, pay, or refer for [contraceptive] coverage." 78 Fed. Reg. 39,870, 39,871 (July 2, 2013). This opt-out mechanism was designed to dissociate the objecting organizations from contraceptive coverage while ensuring that the individuals covered under those organizations' health plans—people not fairly presumed to share the organizations' opposition to

---

[2] An organization qualifies as a "religious employer" under the regulations if it is "organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a). Those provisions, in turn, refer to "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i), (iii).

contraception or to be co-religionists—could obtain coverage for contraceptive services directly through separate plans from the same plan providers. *See id.* at 39,874. Plaintiffs challenge this second mechanism, which the regulations refer to as the "accommodation."

The government designed the accommodation to avoid encumbering Plaintiffs' sincere religious belief that providing, paying for, or facilitating insurance coverage for contraceptives violates their religion, but the government sought at the same time to preserve unhindered access to contraceptives for insured individuals who use them. Many religiously affiliated educational institutions, hospitals, and social-service organizations have taken advantage of the accommodation, and courts of appeals have uniformly sustained it against challenges under RFRA and the Constitution. *See Mich. Catholic Conf. & Catholic Family Servs. v. Burwell*, 755 F.3d 372 (6th Cir. 2014); *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014) *petition for cert. filed* (Oct. 3, 2014) (No. 13-3853).

## B. The Plaintiff Nonprofits Offer Health Insurance in Various Ways

Plaintiffs are eleven Catholic organizations that employ both Catholics and non-Catholics and provide a range of spiritual and charitable services in the Washington, D.C. area.[3] They fall into four categories that differ in ways that affect how the accommodation applies to them, and that are thus relevant to some aspects of our analysis.

---

[3] Father Frank Pavone, Alveda King, and Janet Morana, employees of Plaintiff Priests for Life, are also individually Plaintiffs in this action. We refer to them, along with the organization, collectively as "Priests for Life" or the "*Priests for Life* Plaintiffs."

First, the Roman Catholic Archbishop of Washington (the "Archdiocese"), a corporation sole, is part of the Catholic Church. It provides pastoral care and spiritual guidance to nearly 600,000 Catholics. It is undisputed that the Archdiocese itself is a religious employer and thus is categorically exempt from the requirement to include coverage for contraceptive services for its employees in its self-insured health plan. The Archdiocese operates a self-insured health plan that is considered a "church plan." Church plans are exempt from the Employee Retirement Income Security Act of 1974 ("ERISA"), which regulates private, employer-sponsored benefit plans, including health insurance plans. *See* 29 U.S.C. § 1002(33) (defining "church plan"); *id.* at § 1003(b)(2) (exempting church plans from ERISA); *see generally id.* § 1001 *et seq.* (governing employee benefit plans). The ACA amended ERISA by establishing new requirements for large group health plans and insurers, but the church's provision of benefits to its employees via its church plan is exempt from ERISA, which distinguishes the Archdiocese's claims here from those of the other Plaintiffs. The Archdiocese need not submit any written notice in order to be exempt, and the employees of the Archdiocese are not entitled to contraceptive coverage under the ACA. The Archdiocese nonetheless participates as a Plaintiff in this case in its role as the sponsor of the church plan that some of the other Plaintiffs also use to provide insurance to their employees—a role that the Archdiocese contends makes it complicit in providing them with contraceptive coverage.

The remaining Plaintiffs are all religious nonprofits. It is undisputed that, under the government's regulations, each is eligible for the accommodation, but not the exemption extended to houses of worship.

Comprising the second of the four categories are the so-called "church-plan Plaintiffs," nonprofits affiliated with the Archdiocese that provide educational, housing, and social services to the community and arrange for health insurance coverage for their employees through the Archdiocese's self-insured plan.[4]

Plaintiff Thomas Aquinas College falls under a third category. It also self-insures. It offers its employees health insurance coverage through an organization called the RETA trust, which oversees an ERISA-covered plan set up by the Catholic bishops of California and run by a third-party administrator ("TPA"). The parties agree that the College's plan is not exempt from ERISA as a church plan.

In the fourth category are those Plaintiffs that provide insurance coverage through group health insurance plans they negotiate with private insurance companies. Catholic University of America offers its students and employees health insurance through two separate group insurance plans offered by AETNA and United Healthcare. Priests for Life, a religious nonprofit that encourages clergy to emphasize the value and inviolability of human life, also provides its employees with health insurance through a group insurance plan offered by United Healthcare.

It is undisputed that Plaintiffs all sincerely believe that life begins at conception and that contraception is contrary to

---

[4] The church-plan Plaintiffs are the Consortium of Catholic Academies of the Archdiocese of Washington, Archbishop Carroll High School, Inc., Don Bosco Cristo Rey High School of the Archdiocese of Washington, Inc., Mary of Nazareth Roman Catholic Elementary School, Inc., Catholic Charities of the Archdiocese of Washington, Inc., Victory Housing, Inc., and the Catholic Information Center, Inc.

Catholic tenets.[5]  Priests for Life, for example, was founded to spread the Gospel of Life, which "affirms and promotes the culture of life and actively opposes and rejects the culture of death."  Pls.' Br. 11.  Catholic doctrine prohibits "impermissible cooperation with evil," and thus opposes providing access to "contraceptives, sterilization, and abortion-inducing products," which the Church views as "immoral regardless of their cost."  *Id.* at 12.  The specific acts to which Plaintiffs object are "provid[ing], pay[ing] for, and/or facilitat[ing] access to contraception," any of which they believe would violate the Catholic Church's teachings. *Id.* at 15.

In the past, in accordance with their religious beliefs, Plaintiffs have offered health care coverage to their employees[6] that excluded coverage for "abortion-inducing products, contraception [except when used for non-contraceptive purposes], sterilization, or related counseling." *Id.* at 16.  They structured the coverage in a variety of ways, including through self-insured health plans and group health plans, which they directed to exclude all contraceptive services.  Plaintiffs object to the contraceptive coverage requirement and the accommodation's opt-out mechanism because, they assert, the accommodation fails adequately to dissociate them from the provision of contraceptive coverage and, by making them complicit with evil, substantially burdens their religious exercise in violation of RFRA.  In

---

[5] For ease of reference, we refer to contraception, sterilization, and related counseling services as "contraception" or "contraceptive services."

[6] Throughout this opinion we discuss Plaintiffs' "employees."  We use this term to refer to all individuals covered by Plaintiffs' insurance plans, including employees, students, and other beneficiaries, such as covered dependents.

15

particular, they contend that the regulations, by requiring the plans or TPAs with which they contract to provide the coverage, effectively require Plaintiffs to facilitate it.

## C. Procedural History

Plaintiffs brought two separate suits that proceeded on parallel tracks in district court. The *Priests for Life* Plaintiffs filed their complaint in August 2013 and promptly moved for a preliminary injunction. They challenged the contraceptive coverage requirement and the accommodation as an unjustified substantial burden on their religious exercise in violation of RFRA and raised a variety of constitutional challenges under the Speech and Religion Clauses of the First Amendment and the Equal Protection Clause of the Fifth Amendment.

The district court considered Plaintiffs' request for a preliminary injunction together with the merits, granted the government's motion to dismiss the complaint for failure to state a claim, and denied as moot the parties' cross-motions for summary judgment. Reasoning that "[t]he accommodation specifically ensures that provision of contraceptive services is entirely the activity of a third party—namely the issuer—and Priests for Life plays no role in that activity," the court held that the *Priests for Life* Plaintiffs failed to show a substantial burden on their religious exercise. *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 7 F. Supp. 3d 88, 102 (D.D.C. 2013). The court also rejected each of Priests for Life's constitutional claims. *Id.* at 104-111.

The remaining Plaintiffs—the Archdiocese, Thomas Aquinas College, Catholic University of America, and the church-plan Plaintiffs (referred to collectively as the "*RCAW*

Plaintiffs")—filed their complaint and moved for a preliminary injunction in September 2013, challenging the accommodation under RFRA and the First Amendment. The *RCAW* Plaintiffs further claimed that the government's implementation of the regulations violates the APA, including by adopting an erroneous interpretation of the "religious employer" categorical exemption that precludes the church-plan Plaintiffs from qualifying for it. They also claimed in supplemental briefing that the interim final rule was invalidly promulgated without notice and comment.[7] The *RCAW* case was assigned to a different district judge who also consolidated proceedings on the preliminary injunction and the merits, but who granted in part and denied in part the parties' cross-motions for summary judgment.

The court rejected Catholic University's RFRA claim and granted that of Thomas Aquinas College. *Roman Catholic Archbishop of Wash. v. Sebelius* (*RCAW*), No. 13-1441, 2013 WL 6729515, at \*15-24 (D.D.C. Dec. 20, 2013). The court held that the accommodation did not impose a substantial burden on Catholic University's religious exercise because "the accommodation effectively severs an organization that offers its employees or students an insured group health plan from participation in the provision of the contraceptive coverage." *Id.* at \*15. The court determined that Thomas Aquinas College was entitled to summary judgment on its RFRA claim, however, because, as the court understood the regulations, "a series of duties and obligations" constituting a substantial burden could fall on the self-insured College if, after the College opted out, its current TPA were to decline to serve as the plan administrator for

---

[7] The *RCAW* Plaintiffs abandoned on appeal their other APA claims.

purposes of the contraceptive coverage requirement.[8] *Id.* at *24. The court granted the government's cross-motion for summary judgment on the other constitutional and APA claims.[9]

All Plaintiffs appealed and sought injunctions pending appeal, while the government cross-appealed the rulings in favor of the *RCAW* Plaintiffs. We consolidated the appeals and granted an injunction pending appeal.

## II. Standard of Review

Whether claims are decided on a motion to dismiss or for summary judgment, we review the district courts' determinations *de novo*. *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012); *Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009). A motion to dismiss for failure to state a claim should be granted if the complaint does not

---

[8] The court also granted summary judgment to both Thomas Aquinas College and the church-plan Plaintiffs on their challenge to the so-called "non-interference" regulation, which prevented a self-insured organization from seeking to "influence" a TPA. The court concluded that the regulation imposed an unconstitutional content-based limitation that "directly burdens, chills, and inhibits" Plaintiffs' free speech. *RCAW*, 2013 WL 6729515, at *37-38. That regulation has since been rescinded, 79 Fed. Reg. 51,092, 51,095 (Aug. 27, 2014), rendering that claim moot.

[9] The district court believed that, because the Archdiocese is exempt from the contraceptive coverage requirement, it was "not joined in" the RFRA claim, *RCAW*, 2013 WL 6729515, at *8, and that the church-plan Plaintiffs lacked standing to bring such a claim, *id.* at *24-27. The court also concluded that some Plaintiffs lacked standing to raise some of the other claims alleged in the complaint. *See, e.g.*, *id.* at *43-44, 47. To the extent necessary to establish this Court's subject matter jurisdiction, we address standing below.

contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III. Standing

The *RCAW* district court concluded that the church-plan Plaintiffs lack standing to challenge the accommodation. 2013 WL 6729515, at \*26. The government does not press that issue on appeal, but we have an independent obligation to confirm our jurisdiction. *See Ams. for Safe Access v. DEA*, 706 F.3d 438, 442 (D.C. Cir. 2013). "[I]n determining whether plaintiffs have standing, we must assume that on the merits they would be successful in their claims." *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008) (internal alterations and quotation marks omitted).

Plaintiffs contend that they are injured by the challenged regulations because they are forced to choose among options, each of which, they argue, would require them to violate their sincerely held religious beliefs: They may either directly provide contraceptive coverage to their employees, or pay onerous penalties for failing to include contraceptive coverage in their plans. The government has offered them a third option in the form of the accommodation: exclude contraceptive coverage from their plans. They object to that, too, however, because if they exclude contraceptive coverage

from their plans, the regulations require someone else to provide it in a way that they contend amounts to their facilitation of the objected-to coverage. Plaintiffs further claim that they are faced with those impossible choices as a result of the ACA regulations, and that a ruling from this Court invalidating those regulations would redress their injury. As a general matter, the government does not contest that Plaintiffs' claimed injury is legally cognizable and concrete.

In successfully challenging the church-plan Plaintiffs' standing in district court, the government argued that it lacks authority to impose on those particular Plaintiffs the harm of which they complain and that they thus cannot allege sufficient injury to support standing. Specifically, the government contended that it could not require a TPA—the firm the Archdiocese hired to administer its plan and process its claims—to provide contraceptive coverage to the church-plan Plaintiffs' employees.[10] In those circumstances, the government contended, a legal victory in this case would change nothing.

---

[10] That is because church plans (such as the Archdiocese's) are exempt from ERISA, 29 U.S.C. § 1003(b)(2), and ERISA is the only vehicle through which the government may enforce a TPA's obligation to provide contraception coverage under the accommodation. *See* 29 C.F.R. § 2510.3-16(b). The government claimed that, in light of its lack of a governmental enforcement mechanism, the Archdiocese's TPA could not be expected to provide the requisite coverage to the church-plan Plaintiffs' employees. As a result of that regulatory loophole, the district court held that the church-plan Plaintiffs are not injured by either the contraceptive coverage requirement or the requirement that they complete the self-certification as a condition of opting out.

Whether or not the obligation is enforceable, however, it is undisputed that, if the church-plan Plaintiffs want a religious accommodation, they are legally required to request it through the opt-out process. Like all the other Plaintiffs, the church-plan Plaintiffs allege that their religious beliefs forbid them from availing themselves of the accommodation because doing so would render them complicit in a scheme aimed at providing contraceptive coverage. They thus contend that the burden on their religious exercise is the same as the burden on any Plaintiff whose TPA or insurer provides coverage according to the regulations. Their burdens are equally concrete, even though the asserted burden on the other Plaintiffs is backed by a threat of enforcement against a potentially recalcitrant TPA, whereas the church-plan Plaintiffs' asserted burden is not. Because the regulations require the church-plan Plaintiffs to take an action that they contend substantially burdens their religious exercise, they, like the other Plaintiffs, have alleged a sufficiently concrete injury.[11] *See In re Navy Chaplaincy*, 697 F.3d 1171, 1176-77 (D.C. Cir. 2012) (holding that "policies and procedures" that plaintiff claimed produced future injury on the basis of religious belief were sufficient to confer standing).

The Archdiocese presents a distinct standing question because it is completely exempt from the challenged

---

[11] Two of the church-plan Plaintiffs, Catholic Information Center and Don Bosco, have fewer than 50 employees and therefore are not subject to the ACA's requirement that employers provide their employees with health insurance. *See* 26 U.S.C. § 4980H(a), (c)(2). We need not address whether that affects their standing, however, because the presence of other Plaintiffs with standing is sufficient to satisfy Article III. *See, e.g.*, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

regulation. It contends that it has a RFRA claim because it sponsors the self-insured plan in which the church-plan Plaintiffs participate. It argues that, despite its own exemption, it faces an impossible choice of either sponsoring a plan that will provide the employees of the church-plan Plaintiffs with access to contraceptive services, or no longer extending its plan to those entities, leaving them exposed to penalties if they do not contract with another provider that will provide the coverage. The first option, in its view, substantially burdens its sincerely held religious beliefs in violation of RFRA, and the second option allows the government to interfere with what it casts as its internal operations, in violation of the Religion Clauses of the First Amendment. Our holding that the church-plan Plaintiffs have standing also supports the Archdiocese's claim of redressable injury adequate to support its standing to sue.[12]

## IV. RFRA Claim

The claim that lies at the heart of this case is Plaintiffs' RFRA challenge to the accommodation. RFRA provides that the federal government may not "substantially burden" a person's religious exercise, even if the burden results from a rule that applies generally to religious and non-religious persons alike, unless the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. In other words, if the law's requirements do not amount to a substantial burden under RFRA, that is the end of the matter. Where a law does

---

[12] Because the Archdiocese's RFRA claim derives from its sponsorship of a plan that also insures employees of the church-plan Plaintiffs, the Archdiocese's claim rises and falls with that of the church-plan Plaintiffs and so is not separately analyzed below.

impose a substantial burden, Congress has instructed that "we must return to 'the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972).'" *Kaemmerling v. Lappin*, 553 F.3d 669, 677 (D.C. Cir. 2008) (quoting 42 U.S.C. § 2000bb(b)(1)). Congress directly referenced and incorporated the legal standards the Supreme Court used in its pre-*Smith* line of cases in RFRA. Constitutional free exercise cases that predate *Smith* accordingly remain instructive when determining RFRA's requirements. *See id.* at 678-80.

We pause at the outset to make some general observations about the contours of Plaintiffs' claims. First, Plaintiffs' case is significantly different from the recent, successful Supreme Court challenge brought by for-profit, closely-held corporations in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). There, the Court concluded that, *in the absence of any accommodation*, the contraceptive coverage requirement imposed a substantial burden on the religious exercise of for-profit corporations because those plaintiffs were required either to provide health insurance coverage that included contraceptive benefits in violation of their religious beliefs, or to pay substantial fines. *Id.* at 2775-76. A critical difference here is that the regulations already give Plaintiffs the third choice that the for-profit corporate plaintiffs in *Hobby Lobby* sought: They can avoid both providing the contraceptive coverage and the penalties associated with non-compliance by opting out of the contraceptive coverage requirement altogether.

Plaintiffs contend that, even with the choice to opt out, the regulations leave them with the same "Hobson's choice" as the for-profit corporations in *Hobby Lobby*. In their view, availing themselves of the accommodation requires them to violate their sincerely held religious beliefs just as surely as

would providing contraceptive coverage to their employees. But the opt out already available to Plaintiffs is precisely the alternative the Supreme Court considered in *Hobby Lobby* and assumed would not impinge on the for-profit corporations' religious beliefs even as it fully served the government's interest.[13] *Id.* at 2782.

This case also differs from *Hobby Lobby* in another crucial respect: In holding that Hobby Lobby must be accommodated, the Supreme Court repeatedly underscored that the effect on women's contraceptive coverage of extending the accommodation to the complaining businesses "would be precisely zero." *Id*. at 2760; *see also id*. at 2781 n.37 ("Our decision in these cases need not result in any detrimental effect on any third party."); *id.* at 2782 (extending accommodation to Hobby Lobby would "protect the asserted needs of women as effectively" as not doing so). Justice Kennedy in his concurrence emphasized the same point, that extending the accommodation to for-profit corporations "equally furthers the Government's interest but does not

---

[13] Plaintiffs also have a fourth option under the ACA: ceasing to offer health insurance as an employment benefit, and instead paying the shared responsibility assessment and leaving the employees to obtain subsidized health care coverage on a health insurance exchange. *See* 26 U.S.C. § 4980H. That is permitted by the Act and regulations and might well be less expensive to employers than contributing to employee health benefits. Plaintiffs, however, contend that declining to arrange health insurance benefits for their employees also would injure them because it would be inconsistent with their religious mission and would deny them the recruitment and retention benefits of providing tax-advantaged health care coverage to their employees. *See* Oral Arg. Tr. at 19:5-15; *see also* Pls.' R. Br. 21 n.9; *see generally Hobby Lobby*, 134 S. Ct. at 2776-77 & n. 32. The government has not pressed the point here.

impinge on the plaintiffs' religious beliefs." *Id*. at 2786. The relief Plaintiffs seek here, in contrast, would hinder women's access to contraception. It would either deny the contraceptive coverage altogether or, at a minimum, make the coverage no longer seamless from the beneficiaries' perspective, instead requiring them to take additional steps to obtain contraceptive coverage elsewhere.

Second, Plaintiffs' claim is extraordinary and potentially far reaching: Plaintiffs argue that a religious accommodation, designed to permit them to free themselves entirely from the contraceptive coverage requirement, itself imposes a substantial burden. As the Seventh Circuit put the point, "[w]hat makes this case and others like it involving the contraception exemption paradoxical and virtually unprecedented is that the beneficiaries of the religious exemption are claiming that the exemption process itself imposes a substantial burden on their religious faiths." *Notre Dame*, 743 F.3d at 557. As the *Notre Dame* court noted, it is analogous to a religious conscientious objector to a military draft claiming that the act of identifying himself as such on his Selective Service card constitutes a substantial burden because that identification would then "trigger" the draft of a fellow selective service registrant in his place and thereby implicate the objector in facilitating war. *Id.* at 556.

Religious objectors do not suffer substantial burdens under RFRA where the only harm to them is that they sincerely feel aggrieved by their inability to prevent what other people would do to fulfill regulatory objectives after they opt out. *Cf. id.* at 556. They have no RFRA right to be free from the unease, or even anguish, of knowing that third parties are legally privileged or obligated to act in ways their religion abhors. *See generally Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988) (distinguishing

between right to avoid being "coerced . . . into violating their religious beliefs" and the lack of right to pursue "spiritual fulfillment according to their own religious beliefs"). "Government simply could not operate if it were required to satisfy every citizen's religious needs and desires." *Id.* at 453.

We now turn to the substance of Plaintiffs' RFRA claims. We first consider their contention that the accommodation imposes a substantial burden on their religious exercise that is cognizable under RFRA. We then analyze the government's claim that any such burden is justified under RFRA because it could not be made any lighter and still serve the government's compelling interests.

### A. The Accommodation Does Not Substantially Burden Plaintiffs' Religious Exercise

In our cosmopolitan nation with its people of diverse convictions, freedom of religious exercise is protected yet not absolute. That is true under the heightened standard Congress enacted in RFRA as well as the constitutional baseline set by the Free Exercise Clause. The limitations that prove determinative here are that only "substantial" burdens on religious exercise require accommodation, and that an adherent may not use a religious objection to dictate the conduct of the government or of third parties. This Court explained in *Kaemmerling* that "[a] substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" 553 F.3d at 678 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)). A burden does not rise to the level of being substantial when it places "[a]n inconsequential or *de minimis* burden" on an adherent's religious exercise. *Id.* (citing *Levitan v. Ashcroft*, 281 F.3d 1313, 1320-21 (D.C. Cir.

2002)). An asserted burden is also not an actionable substantial burden when it falls on a third party, not the religious adherent. *See, e.g.*, *Bowen v. Roy*, 476 U.S. 693, 699 (1986).

Plaintiffs' objection rests on their religious belief that "they may not provide, pay for, and/or facilitate access to contraception, sterilization, abortion, or related counseling in a manner that violates the teachings of the Catholic Church." Pls.' Br. 15. But the regulations do not compel them to do any of those things. Instead, the accommodation provides Plaintiffs a simple, one-step form for opting out and washing their hands of any involvement in providing insurance coverage for contraceptive services.

### 1. The Court Must Evaluate Assertions of Substantial Burden

The sincerity of Plaintiffs' religious commitment is not at issue in this litigation. Plaintiffs are correct that they—and not this Court—determine what religious observance their faith commands. There is no dispute about the sincerity of Plaintiffs' belief that providing, paying for, or facilitating access to contraceptive services would be contrary to their faith.

Accepting the sincerity of Plaintiffs' beliefs, however, does not relieve this Court of its responsibility to evaluate the substantiality of any burden on Plaintiffs' religious exercise, and to distinguish Plaintiffs' duties from obligations imposed, not on them, but on insurers and TPAs. Whether a law substantially burdens religious exercise under RFRA is a question of law for courts to decide, not a question of fact. *See Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) (stating that judicial inquiry into the substantiality of the

burden "prevent[s] RFRA claims from being reduced into questions of fact, proven by the credibility of the claimant"); *Kaemmerling*, 553 F.3d at 679 ("[a]ccepting as true the factual allegations that Kaemmerling's beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened"). "[A]lthough we acknowledge that the [plaintiffs] believe that the regulatory framework makes them complicit in the provision of contraception, we will independently determine what the regulatory provisions require and whether they impose a substantial burden on [plaintiffs'] exercise of religion." *Mich. Catholic Conf.*, 755 F.3d at 385; *see also Notre Dame*, 743 F.3d at 558 ("Notre Dame may consider the [self-certification] process a substantial burden, but substantiality—like compelling governmental interest—is for the court to decide.").

Our own decision in *Kaemmerling* requires that we determine whether a burden asserted by Plaintiffs qualifies as "substantial" under RFRA. In *Kaemmerling*, a federal prisoner sought to enjoin the Bureau of Prisons under RFRA from collecting a sample of his blood, claiming a religious objection to "DNA sampling, collection and storage with no clear limitations of use." 553 F.3d at 678. We observed that "Kaemmerling's objection to 'DNA sampling and collection'" was not "an objection to the [Bureau] collecting any bodily specimen that contains DNA material . . . , but rather an objection to the government extracting DNA information from the specimen." *Id.* at 679. We did not simply accept Kaemmerling's characterization of his burden as "substantial," but instead independently evaluated the nature of the claimed burden on his religious beliefs. *See id.* at 678-79. The plaintiff failed to "allege facts sufficient to state a substantial burden on his religious exercise because he [could not] identify any 'exercise' which is the subject of the

burden to which he objects." *Id.* at 679. The court acknowledged that "the government's activities with his fluid or tissue sample after the [Bureau] takes it may offend Kaemmerling's religious beliefs," but it rejected the substantial burden contention because "Kaemmerling alleges no religious observance that the DNA Act impedes, [n]or acts in violation of his religious beliefs that it pressures him to perform." *Id.*

In *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001), this Court similarly rejected the plaintiffs' formulation of the substantial-burden test as forbidding the government's general application of religiously neutral law where it would impose *any* burden on religiously motivated conduct because doing so would "read out of RFRA the condition that only substantial burdens on the exercise of religion trigger the compelling interest requirement." As RFRA sponsor Senator Orrin Hatch explained, the Act "does not require the Government to justify every action that has some effect on religious exercise. Only action that places a substantial burden on the exercise of religion must meet the compelling State interest . . . ." 139 Cong. Rec. 26,180 (1993) (statement of Sen. Hatch).

Under free exercise precedents that RFRA codified, the Supreme Court distinguished between substantial burdens on religious exercise, which are actionable, and burdens that are not. Burdens that are only slight, negligible, or *de minimis* are not substantial. And burdens that fall only on third parties not before the court do not substantially burden plaintiffs. *See, e.g.*, *Bowen*, 476 U.S. at 699 ("The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens."); *Lyng*, 485 U.S. at 447 (finding it undisputed that the government's action "will

have severe adverse effects on the practice of [plaintiffs'] religion," but disagreeing that such burden was "heavy enough" to subject that action to strict scrutiny).

In *Bowen*, a Native American plaintiff brought a free exercise challenge to a statute requiring the state to use his daughter's social security number to process welfare benefits requests. 476 U.S. at 695-96. Roy, the father, believed that the government's use of the social security number of his daughter, Little Bird of the Snow, would serve to "'rob the spirit' of his daughter and prevent her from attaining greater spiritual power." *Id.* at 696. The Court rejected Roy's claim on the basis that, rather than complaining about a restriction on his own conduct, Roy sought to "dictate the conduct of the Government's internal procedures." *Id.* at 700. Roy's claim failed because, even though it seriously offended Roy's religious sensibilities, "[t]he Federal Government's use of a Social Security number for Little Bird of the Snow d[id] not itself in any degree impair Roy's freedom to believe, express, and exercise his religion." *Id.* at 700-01 (internal quotation marks omitted).

Building on the analysis in *Bowen*, the Supreme Court refused to apply strict scrutiny to the government's land use decision in *Lyng*. 485 U.S. at 450. There, members of Indian tribes claimed that the federal government violated their right to free exercise by permitting timber harvesting and construction on land they used for religious purposes. *Id.* at 441-42. The Court stated that its free exercise jurisprudence "does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions." *Id.* at 450-51.

According to Plaintiffs, this Court is bound to accept their understanding of the obligations the regulations impose—including their view of the existence and substantiality of any burden on their own religious exercise— because to do otherwise would be tantamount to questioning the sincerity of their beliefs. Indeed, under Plaintiffs' view, we must accept a RFRA claimant's understanding of what the challenged law requires her to do (or to refrain from doing), even if that subjective understanding is at odds with what the law actually requires.[14] Plaintiffs' approach collapses the distinction between sincerely held belief and substantial burden. We must give effect to each term in the governing statute, however, including the requirement that only "substantial" burdens on religious exercise trigger strict

---

[14] Plaintiffs elaborated their position in their responses to a hypothetical posed during oral argument. We posited a situation in which an adherent, similar to the plaintiff in *Thomas*, objected to working in a factory on the grounds that the tools he was manufacturing were being used to support a war effort that his sincere religious beliefs prohibited him from supporting. *See Thomas*, 450 U.S. at 710 (after being transferred to a department that "fabricated turrets for military tanks, . . . [Thomas] quit, asserting that he could not work on weapons without violating the principles of his religion"). Unlike the facts in *Thomas*, however, in our hypothetical, the adherent was not manufacturing tools used for war, but rather farm equipment that had no relationship whatsoever to any military effort. Counsel for both the *Priests for Life* Plaintiffs and the *RCAW* Plaintiffs conceded that, under their view, if the religious objection was to war machinery, not farm tools, a plaintiff who misperceived the facts underlying his challenge would be entitled nonetheless to a determination that requiring him to continue working in a farm tools factory imposed a substantial burden on his religious observance merely because he sincerely believed that it did. Oral Arg. Tr. at 9:3-11:16; 22:16-23:24.

scrutiny. We cannot accept Plaintiffs' proposal to prevent the court from evaluating the substantiality of the asserted burden.

**2. The Accommodation Frees Eligible Organizations from the Contraceptive Coverage Requirement**

A review of the regulatory accommodation shows that the opt-out mechanism imposes a *de minimis* requirement on any eligible organization: The organization must send a single sheet of paper honestly communicating its eligibility and sincere religious objection in order to be excused from the contraceptive coverage requirement. Once an eligible organization has taken the simple step of objecting, all action taken to pay for or provide its employees with contraceptive services is taken by a third party.

Specifically, the regulations require that, to be eligible for the accommodation, an organization must certify that it has a sincere religious objection to arranging contraceptive coverage.[15] *See* 45 C.F.R. § 147.131(b); 29 C.F.R. § 2590.715-2713A(a). The organization opts out under the regulations by affirming that it meets those eligibility criteria via a "self-certification" form sent to its group health plan issuer or TPA, or a letter to the Secretary of HHS (the "alternative notice"). 45 C.F.R. § 147.131(c)(1); 29 C.F.R. § 2590.715-2713A(b)(1)(ii); *see also* 79 Fed. Reg. 51,092,

---

[15] The Supreme Court, in *Hobby Lobby*, 134 S. Ct. at 2782, characterized the accommodation HHS designed for eligible organizations as a less restrictive means of serving the government's interest in the contraceptive coverage requirement that should be made available to the closely-held, for-profit religious corporate plaintiffs in that case. The government accordingly is extending the accommodation to such companies. *See* 79 Fed. Reg. at 51,094.

51,094-95 (Aug. 27, 2014). An alternative notice to HHS must identify the forms of contraceptive services to which the employer objects, and specify, among other things, the name of the plan, the plan type, and the contact information for the plan issuer or TPA.[16] 45 C.F.R. § 147.131(c)(1)(ii); 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B). Once an eligible organization avails itself of the accommodation, that organization has discharged its legal obligations under the challenged regulations. *See* 45 C.F.R. § 147.131(c)(1), (e)(2); 29 C.F.R. § 2590.715-2713A(b)(1); 79 Fed. Reg. at 51,094-95.

The accommodation here works in the way such mechanisms ordinarily do: the objector completes the written equivalent of raising a hand in response to the government's query as to which religious organizations want to opt out. Once the eligible organization expresses its desire to have no involvement in the practice to which it objects, the government ensures that a separation is effectuated and arranges for other entities to step in and fill the gap as required to serve the legislatively mandated regime. Specifically, the regulations:

- require that the group health plan insurer expressly exclude contraceptive coverage from the eligible

---

[16] Initially, an eligible organization could only avail itself of the accommodation by completing the self-certification form. The Supreme Court issued an interim order in *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014), however, permitting an eligible organization to notify the Secretary of HHS in writing of its objection instead of sending the self-certification directly to the insurer or TPA. *Id.* at 2807. The Departments accordingly issued interim final regulations to authorize opting out using that alternative notice. 79 Fed. Reg. at 51,094-95.

organization's group health plan,[17] 45 C.F.R. § 147.131(c)(2)(i)(A);

- fully divorce the eligible organization from payments for contraceptive coverage, *see* 45 C.F.R. § 147.131(c)(2); 29 C.F.R. § 2590.715-2713A(b)(2)(i);

- require that the insurer or TPA notify the beneficiaries in separate mailings that it will be providing separate contraceptive coverage, 45 C.F.R. § 147.131(d); 29 C.F.R. § 2590.715-2713A(d);

- require that the insurer or TPA specify to the beneficiaries in those separate mailings that their employer is in no way "administer[ing] or fund[ing]" the contraceptive coverage. (The regulations include model language for such notice, suggesting that the insurer or TPA specify to employees that "your employer will not contract, arrange, pay, or refer for contraceptive coverage.") 45 C.F.R. § 147.131(d); 29 C.F.R. § 2590.715-2713A(d); and

- demand separate mailings and accounting on the part of the insurer or TPA, keeping contraceptive coverage separate for all purposes from the eligible organization's plan that exclude it, 45

---

[17] There is no analogous requirement for TPAs because it is the self-insured employer that controls the scope of coverage provided under its plan. Once it has opted out, a self-insured employer has satisfied its legal obligation under the contraceptive-coverage regulations. 29 C.F.R. § 2590.715-2713A(b)(1).

C.F.R. § 147.131(c)(2)(ii), (d); 29 C.F.R. § 2590.715-2713A(b)(2), (d).

The regulations leave eligible organizations free to express to their employees their opposition to contraceptive coverage. In sum, both opt-out mechanisms let eligible organizations extricate themselves fully from the burden of providing contraceptive coverage to employees, pay nothing toward such coverage, and have the providers tell the employees that their employers play no role and in no way should be seen to endorse the coverage.

Plaintiffs' opposition to the consequences of the ACA's Women's Health Amendment, even with the accommodation, amounts to an objection to the regulations' requirement that third parties provide to Plaintiffs' beneficiaries products and services that Plaintiffs believe are sinful. What Plaintiffs object to here are "the government's independent actions in mandating contraceptive coverage, not to any action that the government has required [Plaintiffs] themselves to take." *Notre Dame*, 743 F.3d at 559 (quoting Order at 3, *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 13-5368 (Dec. 31, 2013) (Tatel, J., statement) (hereinafter "Emergency Injunctions Order")). But RFRA does not grant Plaintiffs a religious veto against plan providers' compliance with those regulations, nor the right to enlist the government to effectuate such a religious veto against legally required conduct of third parties. *See, e.g.*, *Lyng*, 485 U.S. at 452; *Bowen*, 476 U.S. at 699-700; *Kaemmerling*, 553 F.3d at 679; *see also Mich. Catholic Conf.*, 755 F.3d at 388-89; *Notre Dame*, 743 F.3d at 552.

Plaintiffs seek to distinguish *Kaemmerling* and *Bowen* on the ground that, unlike the plaintiffs in those cases, they object to what the regulations require of *them*. But the only

action the regulations require of Plaintiffs—completion of the self-certification or alternative notice—imposes a *de minimis* administrative obligation.[18]  To the extent that their objection is to the role of that action in the broader regulatory scheme—a scheme that permits or requires independent coverage providers to take actions to which Plaintiffs object—their challenge is governed by *Kaemmerling* and *Bowen*.  As in *Bowen*, even though Plaintiffs' "religious views may not accept this distinction between individual and governmental conduct," the Constitution does "recognize such a distinction."  476 U.S. at 701 n.6.  So, too, does RFRA.  And just as the plaintiffs in *Bowen* and *Kaemmerling* could not successfully challenge what the government chose to do with their social security numbers or DNA specimens, respectively, Plaintiffs have no RFRA claim against the government's arrangements with others to provide coverage to women left partially uninsured as a result of Plaintiffs' opt out.  RFRA does not treat the government requiring third parties to provide contraceptive coverage in the face of an employer's religious disapproval as tantamount to the government requiring the employer itself to sponsor such coverage.  *See Mich. Catholic Conf.*, 755 F.3d at 388-89; *Notre Dame*, 743 F.3d at 554-55; *id.* at 559 (quoting Emergency Injunctions Order at 3 (Tatel, J., statement)).

Plaintiffs nonetheless insist that, even with the accommodation, the regulations substantially burden their religious exercise by continuing to require that they play a

---

[18] Plaintiffs object that characterizing the accommodation as simply filling out a form ignores the meanings that Plaintiffs attach to the form.  But the meaning Plaintiffs attach to the form derives from their contention that their completion of the form causes third parties to take action.  The error of that contention is discussed more fully *infra* Section IV.A.2.a.

role in the facilitation of contraceptive use. In particular, they contend that: (1) "signing and submitting the self-certification" or alternative notice "triggers" or "impermissibly facilitates delivery of the objectionable coverage" to the beneficiaries of their health plans; (2) the regulations require "contracting with third parties authorized or obligated to provide the mandated coverage;" and (3) the regulations require "maintaining health plans that will serve as conduits for the delivery of the mandated coverage." Pls.' Br. 12, 18; Pls.' Supp'l Br. 1. Additionally, self-insured Plaintiffs contend that their self-certification expressly and impermissibly authorizes their TPAs to provide contraceptive coverage.

Each of those separate, but related, arguments fails for fundamentally the same reason: Notwithstanding Plaintiffs' contrary contentions, the regulations provide an opt-out mechanism that shifts to third parties the obligation to provide contraceptive coverage to which health insurance beneficiaries are entitled, and that fastidiously relieves Plaintiffs of any obligation to contract, arrange, pay, or refer for access to contraception in any way that might constitute a substantial burden on their religious exercise under RFRA.

### a. Plaintiffs' Opt-Out Does Not Trigger Contraceptive Coverage

Plaintiffs claim that the requirement that they submit the self-certification to their plan issuers or TPAs, or submit the alternative notice to the government, makes them "authorize" or "trigger" the provision of the contraceptive coverage they find religiously abhorrent. They characterize the self-certification and alternative notice as "permission slips" for their plan issuers and TPAs to provide contraceptive coverage to Plaintiffs' employees. Pointing to the regulatory

requirements of an insurer or TPA after an eligible organization has availed itself of the accommodation, Plaintiffs argue that it is their own act of self-certifying or completing the alternative notice that "confers . . . both the authority and obligation" on the insurance companies and TPAs to provide the objected-to coverage to Plaintiffs' employees. Pls.' Br. 9.

Plaintiffs' "permission slip" argument misstates how the regulations operate. As the Sixth and Seventh Circuits have also concluded, the insurers' or TPAs' obligation to provide contraceptive coverage originates from the ACA and its attendant regulations, not from Plaintiffs' self-certification or alternative notice. *See Mich. Catholic Conf.*, 755 F.3d at 387; *Notre Dame*, 743 F.3d at 554. The regulations require that "a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage" for a variety of types of preventive care, including the coverage to which Plaintiffs object. 45 C.F.R. § 147.130(a)(1). That obligation exists apart from any action that Plaintiffs take. "'Because Congress has imposed an independent obligation on insurers to provide contraceptive coverage to [an eligible organization's] employees, those employees will receive contraceptive coverage from their insurers *even if* [objectors] self-certify—but not *because* [objectors] self-certify.'" *Notre Dame*, 743 F.3d at 559 (quoting Emergency Injunctions Order at 3 (Tatel, J., statement)).

Indeed, contrary to Plaintiffs' characterization, what the self-certification or alternative notice actually triggers is a series of steps designed to ensure that eligible organizations such as Plaintiffs do *not* contract, arrange, pay, or refer for access to contraceptive services. The regulations fully relieve Plaintiffs from the obligation to provide or pay for

contraceptive coverage, and instead obligate a third party to provide that coverage separately.

The illogic of Plaintiffs' "trigger" argument is highlighted by the conscientious objector scenario recounted above. The implication of Plaintiffs' position is that the Selective Service could deny a religious conscientious objector's RFRA claim against calling up the next draftee only if the government's decision to do so survived strict scrutiny. That strikes us as "a fantastic suggestion." *Notre Dame*, 743 F.3d at 556. There, as here, the feature that defeats Plaintiffs' argument is plain: It was the government's selective service draft quota, not the conscientious objector exercising his accommodation right, that determined whether a replacement would be called. So, too, it is the ACA that requires that plan issuers and TPAs fill the resulting gaps, not the opt-out notice. In neither case is the objecting party substantially burdened by, and thus entitled to accommodation from, the sequelae of opting out. Accurately understood, the opt-out mechanism imposes on Plaintiffs only the *de minimis* administrative burden associated with completing the self-certification form or the alternative notice. *See id*. As long as Plaintiffs complete either notice, the regulations excuse them from any further involvement in providing contraceptive coverage. As discussed above, the beneficiaries receive contraceptive coverage not because Plaintiffs have completed the self-certification or alternative notice, but because the ACA imposes an independent obligation on insurers and TPAs to provide this coverage.

### b. Plaintiffs' Contracts with Providers Do Not Authorize or Facilitate Contraceptive Coverage

Plaintiffs further contend that the regulations substantially burden their religious exercise by requiring

contraceptive coverage to be provided for their employees and students by the same entities with which Plaintiffs have contracted to provide non-contraceptive health coverage. Once Plaintiffs opt out of the contraceptive coverage requirement, however, contraceptive services are not provided to women because of Plaintiffs' contracts with insurance companies; they are provided because federal law requires insurers and TPAs to provide insurance beneficiaries with coverage for contraception. Plaintiffs' contracts do not in any way authorize or condone the insurers' or TPAs' provision of the coverage. The separate interactions between non-objecting insurance companies and beneficiaries do not substantially burden Plaintiffs' religious exercise, just as third-party actions in other religious-exercise cases have been held not to burden plaintiffs. *See, e.g.*, *Bowen*, 476 U.S. at 699-700; *Kaemmerling*, 553 F.3d at 679; *see also Notre Dame*, 743 F.3d at 552. We do not understand Plaintiffs to contend that RFRA privileges them generally to require that the extra-contractual rights and legal obligations of individuals and entities with whom they contract conform to Plaintiffs' religious beliefs, nor could they.

### c. Plaintiffs' Plans Are Not Conduits for Contraceptive Coverage

Plaintiffs also argue that the regulations substantially burden their religious exercise by permitting their insurance plans to be used as conduits through which their employees receive contraception. Plaintiffs identify a number of acts— such as paying premiums and offering enrollment paperwork—that they contend they must take that ensure that the contraceptive "pipeline" remains open. None of those acts, however, requires Plaintiffs to contract, arrange, pay, or refer for access to contraception. Once Plaintiffs take advantage of the accommodation, they are dissociated from

the provision of contraceptive services. The premiums and enrollment paperwork support the provision of health care coverage to which Plaintiffs have no objection—and nothing more.

Plaintiffs contend that their plans remain a conduit for the provision of contraceptives because they are required to pay premiums or fees to entities in charge of the plans that provide contraceptive benefits. The regulations, however, expressly prevent insurers and TPAs from directly or indirectly charging Plaintiffs for the cost of contraceptive coverage and obligate third parties to pay for the contraceptive services. 45 C.F.R. § 147.131(c)(2)(ii); 29 C.F.R. § 2590.715-2713A(b)(2). Therefore, although Plaintiffs are required to pay premiums and fees to their group health plan issuers or TPAs, those entities are legally prohibited from using Plaintiffs' payments to fund contraceptive services.

Plaintiffs further contend that their plans are used as conduits because, they assert, they must provide their beneficiaries with enrollment paperwork to enable them to participate in a plan that provides coverage for contraceptives, and they must send, or tell their beneficiaries where to send, the enrollment paperwork. Under the regulations, however, the employer has no such obligation. The insurer or TPA is entirely responsible for any paperwork related to contraceptive coverage. The insurer or TPA must provide beneficiaries with notice of the availability of contraceptive coverage, the notice must be separate from any materials distributed in connection with the individual's enrollment in the employer's plan, and the notice must make clear that the employer is not playing any role in the contraceptive coverage. 45 C.F.R. § 147.131(d); 29 C.F.R. § 2590.715-2713A(d).

Plaintiffs also argue that their plans serve as conduits because they must identify their health plan beneficiaries to their insurers or TPAs. No regulation related to the accommodation imposes any such duty on Plaintiffs. *See Mich. Catholic Conf.*, 755 F.3d at 389. Plaintiffs will have necessarily provided their plans or TPAs with the names of employees enrolling in their health care plan so that those individuals may be provided with health care coverage. To the extent that Plaintiffs object to the actions the insurers or TPAs will take after receiving those names, Plaintiffs are objecting to an independent obligation imposed on a third party by the government. As discussed above, RFRA does not protect parties from obligations imposed on third parties by outside sources. In short, none of the actions that Plaintiffs identify is actually required of them under the regulations, and none of those actions makes their plans conduits for contraceptive coverage.[19]

### d. Regulations Specific to the Self-Insured Plaintiffs Do Not Create a Substantial Burden

Finally, the self-insured Plaintiffs object to the regulatory provisions that apply particularly to self-insured organizations. They object that their self-certification forms are what designate their TPAs as the plan administrators for contraceptive benefits under section 3(16) of ERISA and also

---

[19] On a related note, Plaintiffs contend that they must refrain from canceling their contract with a third party authorized to provide coverage for contraceptive services and from attempting to influence a third party's decision to provide the coverage for contraception. The government denied that the regulations would require Plaintiffs to refrain from taking either of those actions. Gov. Br. 33-34; Oral. Arg. Tr. at 46:15-48:1. In any event, as discussed *infra* note 28, the regulations have been revised to remove the provision that Plaintiffs alleged so constrained them.

serve as instruments under which the health plans are operated. *See* 29 C.F.R. § 2510.3-16(b). They argue that the regulations thus put them in the position of facilitating the provision of contraceptives by authorizing the TPAs to take actions they previously could not have taken.

That argument miscasts the regulations, which do not require the self-insured Plaintiffs to name their TPAs as ERISA plan fiduciaries. Plaintiffs submit forms to communicate their decisions to opt out, not to authorize TPAs to do anything on their behalf. The regulatory treatment of the form as sufficient under ERISA does not change the reality that the objected-to services are made available because of the regulations, not because Plaintiffs complete a self-certification. 29 C.F.R. § 2510.3-16(b); *see Notre Dame*, 743 F.3d at 554-55; 78 Fed. Reg. at 39,880.

The self-insured Plaintiffs raise a parallel objection to the alternative process established by the revised regulations. Under the revised regulations, once the government receives an alternative notice from an eligible organization, the government sends the TPA a notification that will "designate the relevant [TPA] as plan administrator under section 3(16) of ERISA for those contraceptive benefits that the [TPA] would otherwise manage." 79 Fed. Reg. at 51,095; *see also* 29 C.F.R. § 2510.3-16(b). The regulations make the government's notification to the TPA "an instrument under which the plan is operated." 29 C.F.R. § 2510.3-16(b).

The self-insured Plaintiffs contend that the revised regulations thereby violate ERISA because the government lacks authority to name a plan administrator or amend Plaintiffs' plan instruments. Plaintiffs do not contend, however, that the government lacks authority to author a plan instrument or designate a particular writing as a plan

instrument, and it is this authority the regulations deploy. Once the government receives the alternative notice, it directs the TPA to cover contraceptive services and, treating its own direction as the new plan instrument, the government names the TPA as the plan administrator of contraceptive coverage. ERISA expressly permits a plan instrument to name a plan administrator. 29 U.S.C. § 1002(16)(A)(i) (defining "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated").[20] By naming the plan administrator in the plan instrument, the government complies with ERISA. The government's approach does not, contrary to Plaintiffs' contention, amend or alter Plaintiffs' own plan instruments; the government directs only the contraceptive coverage.

The self-insured Plaintiffs also contend that they are required to facilitate access to contraceptive coverage because, if their existing TPAs decline to assume the responsibility to provide contraceptive coverage, the regulations obligate Plaintiffs to take affirmative steps to identify and contract with new TPAs. The district court granted summary judgment for Plaintiff Thomas Aquinas College on this ground. *RCAW*, 2013 WL 6729515, at \*24. Upon *de novo* review, we reject Thomas Aquinas's argument as premature. Thomas Aquinas has not made any showing that its TPA has any intention of refusing to provide contraceptive coverage to its employees.[21] Moreover, the

---

[20] ERISA also states that "in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified," the administrator is "such other person as the Secretary [of Labor] may by regulation prescribe." 29 U.S.C. § 1002(16)(A)(iii).

[21] *See* 29 C.F.R. § 2590.715-2713A(b)(2) ("If a [TPA] receives a copy of the self-certification . . . *and agrees to enter into or remain*

government has clarified that, if an eligible organization's existing TPA were to decline to assume responsibility for providing contraceptive coverage, the regulations do not require the eligible organization to identify and contract with a new one. *See* 78 Fed. Reg. at 39,880-81. We believe that clarification requires us to vacate the district court's grant of summary judgment for Thomas Aquinas.

* * *

In sum, RFRA grants Plaintiffs a right to be free of any unjustified substantial governmental burden on their religious exercise. The regulatory requirement that they use a sheet of paper to signal their wish to opt out is not a burden that any precedent allows us to characterize as substantial. It is as a result of the ACA, and not because of any actions Plaintiffs must take, that Plaintiffs' employees are entitled to contraceptive coverage provided by third parties and that their insurers or TPA must provide it; RFRA does not entitle Plaintiffs to control their employees' relationships with other entities willing to provide health insurance coverage to which the employees are legally entitled. A religious adherent's distaste for what the law requires of a third party is not, in itself, a substantial burden; that is true even if the third party's conduct towards others offends the religious adherent's sincere religious sensibilities. The regulations go to great lengths to separate Plaintiffs from the provision of contraceptive coverage. Plaintiffs have failed to demonstrate a substantial burden on their religious exercise that would

---

in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the [TPA] shall provide or arrange payments for contraceptive services . . ." (emphasis added)); 78 Fed. Reg. at 39,880.

subject the contraceptive coverage requirement to strict judicial scrutiny.

## B. The Accommodation Survives Strict Scrutiny

When the parties filed their initial briefs on appeal, the government conceded that this Court's decision in *Gilardi v. U.S. Department of Health & Human Services*, 733 F.3d 1208 (D.C. Cir. 2013), *vacated*, 134 S. Ct. 2902 (2014), controlled the compelling-interest inquiry here. Gov. Br. 44. In *Gilardi*, we held at the preliminary injunction stage that, while a closely-held, for-profit business corporation was not a "person" whose religious exercise was protected by RFRA, its individual owners had RFRA rights that were injured by application of the contraceptive coverage requirement to their firm. 733 F.3d at 1214-19. Lack of a regulatory accommodation applicable to such religious objectors constituted a substantial burden, and the government failed to establish a compelling interest that justified it. *Id.* at 1219-22.

While this appeal was pending, the Supreme Court vacated *Gilardi* in view of its decision in *Hobby Lobby*. 134 S. Ct. 2902 (2014). The Court also, in *Wheaton College v. Burwell*, 134 S.Ct. 2806 (2014), preliminarily enjoined the requirement that a party seeking to opt out use the self-certification form as specified in the regulations. The plaintiff in that case already had notified the government of its eligibility and desire for exemption without using that form, and the Court required HHS to accept that as adequate notice. Because the Court's decisions and a new Interim Final Rule responding to the *Wheaton College* order (*see* 79 Fed. Reg. at

51,092) unsettled the governing law, we requested supplemental briefing.[22]

We directed the parties to brief the implications for this appeal of the intervening legal developments. We specifically requested briefing on the substantial-burden and strict-scrutiny issues, and received such briefing from both parties.

*Hobby Lobby*'s analysis is instructive, even though the substantial-burden and least-restrictive-means questions posed by the lack of any accommodation available to the plaintiffs in *Hobby Lobby* are very different from those presented here, where the government has provided an accommodation. As discussed above, we conclude that the accommodation does not impose a substantial burden on Plaintiffs in this case. *See Mich. Catholic Conf.*, 755 F.3d at 390; *Notre Dame*, 743 F.3d at 554-559. To the extent that the Supreme Court's recent order in *Wheaton College* might be read to signal a different conclusion, analysis of the strict scrutiny question is also called for. The *Hobby Lobby* Court's discussion of the weightiness of the government's interests is in substantial tension with *Gilardi*'s approach to the strict scrutiny analysis. We thus proceed in light of the intervening decisions to analyze whether the accommodation is the least restrictive means to serve a compelling governmental interest.

The challenged regulations seek to ensure timely and effective access to contraception for all women who want it and for whom it is medically appropriate. The government contends that the regulations are amply supported because they arise at the intersection of overlapping governmental interests, each of which is compelling: public health, and

---

[22] *See supra* notes 15 & 16.

women's well-being. The government claims an interest in independently assuring seamless contraceptive coverage, regardless of whether the insured woman receives her other health insurance coverage through her (or her family member's) employment at a religious nonprofit that objects to providing it.

The Supreme Court's characterizations of the government's asserted compelling interest and the narrow tailoring of the accommodation were dicta in *Hobby Lobby*. The accommodation was not challenged there; it was only adverted to as a potential remedy for the non-accommodated plaintiffs in that case. As next discussed, however, the Court's characterizations are consistent with our conclusions that (1) the contraceptive coverage requirement—and, specifically, its guarantee for employees whose employers partake of the accommodation—is supported by compelling governmental interests, and (2) it imposes no unnecessary constraints on Plaintiffs' religious exercise.

**1. The Government Has Demonstrated Compelling Interests That Support Seamless Provision of Contraceptive Coverage**

In promulgating the challenged regulations, the government asserted an interest in supporting women's unhindered, cost-free access to contraceptive services. *See* 78 Fed. Reg. at 39,887-88. The Supreme Court in *Hobby Lobby* assumed, without deciding, that the governmental interest in "guaranteeing cost-free access" to contraception was "compelling." *Hobby Lobby*, 134 S. Ct. at 2780. Five members of the Court separately signed onto opinions that appear to be more affirmative. Justice Kennedy, concurring, found it "important to confirm" that the "premise of the Court's opinion is its assumption that the HHS regulation

here at issue furthers a legitimate and compelling interest in the health of female employees." *Id.* at 2786. He noted that the government "makes the case" that the contraceptive coverage requirement "serves the Government's compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee." *Id.* at 2785-86. Justice Ginsburg, writing for four dissenting justices, recounted the government's evidence establishing the importance of contraception to a range of women's health needs, and concluded that contraceptive coverage under the ACA "furthers compelling interests in public health and women's well being." *Id.* at 2799-2800.

There is no simple formula for identifying which governmental interests rank as compelling, but certain touchstones aid our analysis. Interests in public health, safety, and welfare—and the viability of public programs that guard those interests—may qualify as compelling, as may legislative measures to protect and promote women's well being and remedy the extent to which health insurance has not served women's specific health needs as fully as those of men.

The government's asserted compelling interest here, writ large, is in a sustainable system of taxes and subsidies under the ACA to advance public health. That interest is as strong as those asserted in cases such as *United States v. Lee*, 455 U.S. 252, 258 (1982), and *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699-700 (1989), recognizing governmental interests in broad participation in public tax and benefits systems as sufficiently compelling to outweigh countervailing claims that they unjustifiably burdened religious exercise.

In *Lee*, the Supreme Court held that the government's interest in a nationwide social security system was sufficiently weighty to require that an Amish employer pay unemployment and social security taxes, even though the Court acknowledged that doing so would burden the Amish employer's religious beliefs. 455 U.S. at 258. The Court observed that the social security system "serves the public interest by providing a comprehensive insurance system with a variety of benefits available to all participants, with costs shared by employers and employees." *Id.* The system would not have been viable unless broad participation was required, and the Court held that the governmental interest "in assuring mandatory and continuous participation in and contribution to the social security system" sufficed to justify the acknowledged burden on the employer's religious exercise. *Id.* at 258-59.

So, too, in *Hernandez*, the Court rejected a claim that denial of certain tax deductions violated the plaintiffs' religious exercise because "even a substantial burden [on the exercise of religion] would be justified by the broad public interest in maintaining a sound tax system." 490 U.S. at 699-700 (internal quotation marks omitted). The government concluded that the success of the ACA's effort to expand access to health care, improve outcomes, and control costs similarly depends on widespread use of preventive care, which the Act encourages by requiring that particular preventive measures be provided free of cost. *See* 78 Fed. Reg. at 39,872.

The Supreme Court's recognition of compelling governmental interests in the physical health and safety of the public, albeit in factually very different contexts, further supports the gravity of the government's interest in the contraceptive coverage requirement. *See, e.g.*, *Prince v.*

*Massachusetts*, 321 U.S. 158, 165-67 (1944); *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). The Court in *Prince* sustained child labor laws against a free exercise challenge based on the government's paramount interest in protecting the health and welfare of children. 321 U.S. at 165-71. In *Jacobson*, a mandatory, mass vaccination program withstood a constitutional liberty challenge because it served the government's interest in "the public health and the public safety." 197 U.S. at 25-26. Those cases support the strength of health interests behind the contraceptive coverage regulations, which include interests in avoiding health risks to women and children from unplanned pregnancies. Indeed, these very same interests—pediatric care and immunizations—are protected by companion provisions to the Women's Health Amendment in the ACA. *See* 42 U.S.C. § 300gg-13(a)(2), (3). Under Plaintiffs' argument, and contrary to *Prince* and *Jacobson*, those interests could fall to the same type of religious challenge as is leveled here by organizations that sincerely object to the types of care they cover.

The Supreme Court has recognized the interest in eliminating discrimination against women as sufficiently compelling to justify incursions on rights to expressive association. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 625-26 (1984) (recognizing compelling interest in creating "rights of public access" to private goods and services in order to promote women's equal enjoyment of leadership skills, business contacts, and employment promotions). Those cases lend gravitas to the government's interest in the contraceptive coverage requirement as an effort to eradicate lingering effects of sex discrimination. *See generally Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003).

The Supreme Court majority in *Hobby Lobby* characterized the government's interests in "promoting public health and gender equality" as "broadly framed" and noted that RFRA "contemplates a more focused inquiry." 134 S. Ct. at 2779 (internal quotation marks omitted). The government has pathmarked the more focused inquiry by explaining how those larger interests inform and are specifically implicated in its decision to support women's unhindered access to contraceptive coverage. We do not take the government to suggest that its interests in "public health" and "gender equality" necessarily render compelling every subsidiary governmental action that advances them. Each of those interests, however, specifically undergirds the government's decision here to provide seamless coverage of contraceptive services for women who want them and whose doctors prescribe them.

As we explain below, compelling interests converge to support the government's decision, reflected in the challenged regulations, to provide cost-free contraceptive coverage and to remove administrative and logistical obstacles to accessing contraceptive care. Those compelling governmental interests suffice to support requiring eligible organizations to ask for an accommodation if they want to take advantage of one, so that the government can protect its interests by ensuring that the resulting coverage gaps are filled.

### a. Improving Public Health Through Contraceptive Coverage

The ACA is an ambitious effort to reform the health care system in the United States. It is designed to expand access to comprehensive insurance coverage as a means of controlling spiraling health care costs while improving health. *See* Cong. Budget Office, *Key Issues in Analyzing Major*

*Health Insurance Proposals* 1 (2008) ("CBO Report"); *see also* Remarks by the President at the Annual Conference of the American Medical Association (June 15, 2009), http://www.whitehouse.gov/the-press-office/remarks-president-annual-conference-american-medical-association. The United States in recent years spent far more on health care than did many other developed nations. At the same time, the quality of care Americans received was lower and our population was no healthier than people in countries that spent less. CBO Report at 1.

Congress understood that improved health at affordable cost cannot be attained without increased reliance on preventive care. Most people underestimate the importance of prevention and are easily hindered from undertaking preventive steps because the costs and effort of preventive health care are immediate while benefits typically are uncertain and deferred. Many adverse health conditions and an enormous amount of costly care can be avoided if people better understand risky behavior, plan more carefully, and take measures to reduce their risks, exposures, and errors. Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 16-17 (2011) ("IOM Report").[23] Providing preventive care—including patient education, screenings, preventive medications and devices, and early treatment—can be less costly than treating advanced diseases and conditions. *See id.*; *Chronic Diseases and Health Promotion*, Centers for Disease Control and Prevention, http://www.cdc.gov/chronicdisease/overview/ (last visited Nov. 5, 2014); *see also* CBO Report at 136-38. Yet, before enactment of the ACA, only a small portion of health care

---

[23] As noted above, the government directed the HRSA, in consultation with IOM, to develop guidelines for women's preventive care services. This report was part of that effort.

spending went to prevention. *See* Centers for Disease Control and Prevention, *The Power of Prevention* (2009), *available at* http://www.cdc.gov/chronicdisease/pdf/2009-power-of-prevention.pdf.

Congress and the Executive Branch determined that serving the government's compelling public health interests depends on overcoming the human behavioral tendencies of denial and delay documented in the legislative and regulatory record. People tend to eschew preventive care when they have to pay for it, make even minor efforts to learn about and enroll in new programs, keep multiple appointments, or follow new routines. Because "[i]ndividuals are more likely to use preventive services if they do not have to satisfy cost-sharing requirements," 78 Fed. Reg. at 39,872, the ACA requires group or individual health plans to include coverage for a variety of preventive health services without cost sharing. 42 U.S.C. § 300gg-13(a). "Studies have . . . shown that even moderate copayments for preventive services" can "deter patients from receiving those services." IOM Report at 19.

The government further determined that the imperative of providing broad access to preventive care applies with full force to women's health. Congress was informed during debates on the ACA that "too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its costs." 155 Cong. Rec. 28,843 (2009) (statement of Sen. Gillibrand); *see also* 155 Cong. Rec. 28,842-43 (2009) (statement of Sen. Mikulski). In light of this reality, Senator Mikulski proposed the Women's Health Amendment, which expanded the list of preventive health services the ACA required that insurers cover without cost sharing to include preventive health care

and screenings for women.  155 Cong. Rec. 28,800-02 (2009) (codified at 42 U.S.C. § 300gg-13(a)(4)).  Congress in the ACA directed the HRSA to develop the list of covered preventive services.  The HRSA commissioned the IOM to identify preventive health services with strong scientific evidence of health benefits.  The IOM's report recommended preventive services it deemed necessary for women's health and well-being.  HRSA accepted IOM's findings and recommendations, and the Departments relied on them when crafting both the exemption and the accommodation.

The HRSA and IOM concluded that, given women's reproductive health needs, preventive health services for women should include contraceptive coverage.  IOM Report at 109-10; *see also* 77 Fed. Reg. at 8,725.  The government recognized that the cost of reproductive health care, including contraceptives, is significant, and it falls disproportionately on women.  78 Fed. Reg. at 39,873, 39,887.  The vast majority of women who have sex with men use contraceptives at least some of the time.  *See* IOM Report at 103.  Most contraceptives used by women, and the forms that are most effective and fully reversible, are available only with a prescription and in some cases must be administered by a medical professional.  *See id.* at 105; Kimberly Daniels, et al., *Contraceptive Methods Women Have Ever Used: United States, 1982-2010*, 62 Nat'l Health Stat. Rep. 1 (2013), *available at* http://www.cdc.gov/nchs/data/nhsr/nhsr062.pdf (hereinafter "Daniels").  Those forms—including birth control pills, injectable methods, contraceptive patches, and intrauterine devices ("IUD")—have been used at one time or another by 88 percent of women who have had sexual intercourse.  Daniels at 1.

The Institute of Medicine observed that high costs regularly cause women to forego contraception completely or

to choose less effective methods: "Even small increments in cost sharing have been shown to reduce the use of preventive services . . . . The elimination of cost sharing for contraception therefore could greatly increase its use, including the use of the more effective and longer-acting methods, especially among poor and low-income women most at risk for unintended pregnancy." IOM Report at 109; *see also* 78 Fed. Reg. at 39,873. Prescription methods of contraception have lower failure rates than non-prescription methods such as condoms, IOM Report at 105, but can be quite expensive. The cost of an IUD, one of the most convenient and effective forms of reversible contraception, is nearly a month's full-time pay for workers earning the minimum wage, and its cost makes it less likely that women will use it. *Hobby Lobby*, 134 S. Ct. at 2800 (Ginsburg, J., dissenting).

Thus the government decided to require contraceptive coverage without cost sharing because appropriate and consistent use of contraceptives furthers women and children's health in a variety of ways. Enabling couples to control the timing and spacing of pregnancies improves women's health outcomes. Short intervals between pregnancies increase maternal mortality and pregnancy-related complications. IOM Report at 103-04. Even a normal and healthy pregnancy is a demanding physical process for a woman. Pregnancy increases risks of health complications, such as anemia, gestational diabetes, hypertension, hyperemesis gravidarum, and even death. *See generally* 78 Fed. Reg. at 39,872, 39,887 (stressing the importance of covering preventive care to respond to women's unique health needs); *Pregnancy Complications*, Centers for Disease Control and Prevention, http://www.cdc.gov/reproductivehealth/maternalinfanthealth/ pregcomplications.htm (last visited Nov. 5, 2014); *Pregnancy*

*Related Deaths*, Centers for Disease Control and Prevention, http://www.cdc.gov/reproductivehealth/MaternalInfantHealth/ Pregnancy-relatedMortality.htm (last visited Nov. 5, 2014).

A core reason the government sought under the ACA to expand access to contraception is that use of contraceptives reduces unintended pregnancies. According to the Institute of Medicine, in 2001, "49 percent of all pregnancies in the United States were unintended." IOM Report at 102. There is "an 85 percent chance of an unintended pregnancy within 12 months among couples using no method of contraception." *Id.* at 105. Unintended pregnancies elevate health risks for women and children and impose other costs on society. Women whose pregnancies are unintended are more likely to experience depression, anxiety, or domestic violence during those pregnancies. IOM Report at 103; *see also Korte v. Sebelius*, 735 F.3d 654, 725 (7th Cir. 2013) (Rovner, J., dissenting). "In 2001, 42 percent of U.S. unintended pregnancies ended in abortion." IOM Report at 102. Reducing the frequency of unintended pregnancies would reduce the frequency of abortions. 78 Fed. Reg. at 39,872; *see also* IOM Report at 105. Supporting access to contraception empowers women to avoid the physical burdens and risks of pregnancy unless and until they decide to undertake them.

The government further relied on the ways that contraceptive use can promote and improve women's health apart from their procreative health needs. Women contraindicated for pregnancy, such as those with certain heart conditions, hypertension, diabetes, Marfan Syndrome, or lupus, face health hazards from pregnancy that can be life threatening. *See* 78 Fed. Reg. at 39,872; IOM Report at 103-04; *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring), *id*. at 2799 (Ginsburg, J., dissenting). Women

with those conditions have especially critical needs to time their pregnancies appropriately, such as by waiting until their conditions are under control.  Doctors also recommend that women taking certain medications that pose risk to maternal and fetal health avoid getting pregnant.  Hormones manufactured and sold as contraception are also used to treat, manage, or prevent other diseases, such as "certain cancers, menstrual disorders, and pelvic pain."  *Hobby Lobby*, 134 S. Ct. at 2799 (Ginsburg, J., dissenting); *see also* 78 Fed. Reg. 39,872; IOM Report at 107.

The Institute of Medicine reported that, for similar reasons, contraceptive use also promotes the health of infants and children.  Children who are born as the result of unintended pregnancy suffer increased health risks on average, including preterm birth and low birth weight and associated complications.  IOM Report at 103.  Women who do not immediately know they are pregnant, or are ambivalent about bearing children, are more likely to delay prenatal care or engage in behaviors that pose pregnancy related risks.  78 Fed. Reg. at 39,872; IOM Report at 103.  Short intervals between pregnancies also can have serious health consequences for infants, such as low birth weight, prematurity, and small-for-gestational age.  78 Fed. Reg. at 38,872; IOM Report at 103.  Women in hazardous jobs or precarious or dangerous living situations may need to delay pregnancy in order to reduce the health risks for a child.  Permitting women to control the timing and spacing of their pregnancies improves the health and welfare of women, children, and infants.

### b. Assuring Women Equal Benefit of Preventive Care By Requiring Coverage of Their Distinctive Health Needs

The government also relied on evidence that advancing women's well being by meeting their health needs as fully as those of men was a compelling reason for a contraceptive coverage requirement. In enacting and implementing the ACA, the government sought to provide coverage that offers equal benefit for men and women. 78 Fed. Reg. at 39,887. Before the ACA, insurance coverage for a female employee was "significantly more costly than for a male employee." *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring). Women paid more for the same health insurance coverage available to men and "in general women of childbearing age spen[t] 68 percent more in out-of-pocket health care costs than men." 155 Cong. Rec. 28,843 (2009) (statement of Sen. Gillibrand); *see* 78 Fed. Reg. at 39,887.

The government recognized that women pay more for the same health benefits in part because services more important or specific to women have not been adequately covered by health insurance. *See* 155 Cong. Rec. 28,843 (2009) (statement of Sen. Gillibrand). Contraception is a key element of preventive care for many women, yet the methods that are most reliable and are under a woman's control require prescriptions and are disproportionately more expensive than non-prescription forms of contraception. *See* IOM Report at 105, 108. Condoms, which are inexpensive and widely available over the counter, require men's cooperation and are substantially less effective in pregnancy prevention than prescription methods. *See id.* at 105. When Congress added the Women's Health Amendment to the ACA, which requires group health plans to include preventive health care services for women without cost sharing, it did so precisely to end "the

punitive practices of the private insurance companies in their gender discrimination." 155 Cong. Rec. 28,842 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski). The government concluded that a preventive care package that failed to cover contraception would not give women access, equal to that enjoyed by men, to the full range of health care services recommended for their specific needs. *See* 78 Fed. Reg. at 39,887.

For most women, whether and under what circumstances to bear a child is the most important economic decision of their lives. An unintended pregnancy is virtually certain to impose substantial, unplanned-for expenses and time demands on any family, and those demands fall disproportionately on women. As the Supreme Court has recognized "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 856 (1992); 78 Fed. Reg. at 39,873 ("[A]ccess to contraception improves the social and economic status of women."). Congress noted when enacting the Pregnancy Discrimination Act, Pub. L. No. 95-555, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e *et seq.*), and Family and Medical Leave Act, Pub. L. No. 103-3, 107 Stat. 6 (codified at 29 U.S.C. § 2601 *et seq.*), a woman's ability to get pregnant has led to pervasive discrimination in the workplace.[24]

---

[24] *See Hibbs*, 538 U.S. at 736 ("'Historically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women's roles has in turn justified discrimination against women when they are mothers or mothers-to-be.'" (quoting *The Parental and Medical*

The government has amply substantiated its compelling interests in the accommodation. The government has overlapping and mutually reinforcing compelling interests in promoting public health and gender equality. The contraceptive coverage requirement specifically advances those interests. It was adopted to promote women's equal access to health care appropriate to their needs, which in turn serves women's health, the health of children, and women's equal enjoyment of their right to personal autonomy without unwanted pregnancy. We hold that the accommodation is supported by the government's compelling interest in providing women full and equal benefits of preventive health coverage, including contraception and other health services of particular relevance to women.

**2.  The Regulations Use the Least Restrictive Means to Ensure Contraceptive Coverage While Accommodating Religious Exercise**

In addition to calling on us to inquire whether the challenged contraceptive coverage requirement serves a compelling interest, RFRA demands that we guard against unnecessary impositions on religious exercise by carefully examining the particular way the government has gone about serving that interest. The Departments designed the challenged accommodation for eligible organizations fully cognizant of RFRA's mandate. *See* 78 Fed. Reg. at 39,886-

---

*Leave Act of 1986: Joint Hearing before the Subcommittee on Labor–Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor*, 99th Cong., 2d Sess., 100 (1986)); *see also* S. Rep. No. 95-331, at 3 (1977) ("A failure to address discrimination based on pregnancy, in fringe benefits or in any other employment practice, would prevent the elimination of sex discrimination in employment.").

88. As already described, the accommodation excuses eligible organizations from the contraceptive coverage requirement, severs them from any involvement in the separate contraceptive coverage to which the employees are entitled, and specifies that employees must be notified that the objecting organizations have no involvement in providing their contraceptive coverage.

Adverting to this accommodation in *Hobby Lobby*, the Supreme Court stressed that it alleviates the burden on the plaintiffs of having to provide contraceptive coverage and "serves HHS's stated interests equally well." *Hobby Lobby*, 134 S. Ct. at 2782. The Court described the accommodation as "an alternative that achieves all of the Government's aims while providing greater respect for religious liberty." *Id.* at 2759; *see id.* at 2786 (Kennedy, J., concurring) (the "accommodation equally furthers the Government's interest but does not impinge on the plaintiff's religious beliefs"). In fact, the Court explained that the effect of the accommodation on women "would be precisely zero." *Id.* at 2760.

In determining whether the government has used the least restrictive means, the Supreme Court has instructed that we focus on the context of the religious objectors, and consider whether and how the government's compelling interest is harmed by "'granting specific exemptions to particular religious claimants.'" *Hobby Lobby*, 134 S. Ct. at 2779 (quoting *Gonzales v. O Centro Espírita Beneficiente Uniao Do Vegetal*, 546 U.S. 418, 431 (2006)). We must "look to the marginal interest in enforcing" the regulation to which the plaintiffs object. *Id.* (citing *O Centro*, 546 U.S. at 431).

The government's compelling interests in the contraceptive coverage requirement are met with the least

imposition on religious exercise by allowing eligible organizations to opt out, but requiring them to identify themselves when they do.  Only if the eligible organizations communicate that they are dropping contraceptive coverage from the health insurance they have arranged for their employees will the government be able to ensure that the resultant gaps in employees' coverage are otherwise filled.  The government contends that its interests would be impaired if eligible organizations were entitled to exempt themselves from the contraceptive coverage requirement without notifying either HHS, or their insurers or TPAs.

The government has an interest in the uniformity of the health care system the ACA put in place, under which all eligible citizens receive the same minimum level of coverage.  Like the Social Security system at issue in *Lee*, the ACA "serves the public interest by providing a comprehensive insurance system with a variety of benefits available to all participants."  455 U.S. at 258.  Contraceptive coverage must be effective if it is to serve the government's compelling interests, and the Departments were justified in concluding that, to be effective, the coverage must be provided to all women who want it, on the same terms as other preventive care.  Providing contraceptive services seamlessly together with other health services, without cost sharing or additional administrative or logistical burdens and within a system familiar to women, is necessary to serve the government's interest in effective access.  Imposing even minor added steps would dissuade women from obtaining contraceptives and defeat the compelling interests in enhancing access to such coverage.  *See* 78 Fed. Reg. at 39,888.

The evidence shows that contraceptive use is highly vulnerable to even seemingly minor obstacles.  Plaintiffs suggest that the government could offer tax deductions or

credits for the purchase of contraceptive services, expand eligibility for existing federal programs that provide free contraception, allow women to submit receipts to the federal government for reimbursement, or provide incentives for pharmaceutical companies to provide contraceptives free of charge to women. Pls.' R. Br. 22. Those alternatives would substantially impair the government's interest. Plaintiffs' proposed alternatives each would add steps—requiring women to identify different providers or reimbursement sources, enroll in additional and unfamiliar programs, pay out of pocket and wait for reimbursement, or file for tax credits (assuming their income made them eligible)—or pose other financial, logistical, informational, and administrative burdens. *See* 78 Fed. Reg. at 39,888. Even assuming that any alternative program had or would develop the capacity to deal with an enormous additional constituency, it would not serve the government's compelling interest with anywhere near the efficacy of the challenged accommodation and would instead deter women from accessing contraception. *See id.*

Plaintiffs also dispute the government's compelling interest in applying the contraceptive coverage requirement to them on the ground that there is "no evidence" showing that Plaintiffs' employees lack access to or want contraception. Pls.' Supp'l Br. 16-17. The data upon which the government relies support its conclusion that women generally benefit from access to contraceptive coverage, and are unlikely to use such coverage when it is costly or complicated to obtain. *See* 78 Fed. Reg. at 39,887-88. There is no reason to believe that the health needs of Plaintiffs' employees or spouses and other covered beneficiaries in their families are materially different from those of other women. Religious nonprofits like the Plaintiff organizations employ millions of Americans—including individuals who do not share their beliefs. As the government recognized, "[e]mployers that do not primarily

employ employees who share the religious tenets of the organization are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives." 77 Fed. Reg. at 8,728. The evidence justifying the contraceptive coverage requirement equally supports its application to Plaintiffs.

Accommodating religious entities need not come at the cost of the compelling interests the government program serves. When the interests of religious adherents collide with an individual's access to a government program supported by a compelling interest, RFRA calls on the government to reconcile the competing interests. In so doing, however, RFRA does not permit religious exercise to "unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling." *Hobby Lobby*, 134 S. Ct. at 2786-87 (Kennedy, J., concurring); *see also id.* at 2781 n.37 ("It is certainly true that in applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries.'"). The opt out offered to religious adherents allows the government to further its compelling interests with the least restriction on religious exercise. Under the accommodation, eligible organizations are relieved of the obligation to include contraceptive coverage in their health care plans, but "women would still be entitled to all FDA-approved contraceptives without cost sharing." *Id.* at 2760. Allowing eligible organizations to exempt themselves completely from the contraceptive coverage requirement, without so much as notifying their plan or HHS that they have done so, would undermine the government's interest in the breadth of the scheme established in the ACA.

The government's interest in a comprehensive, broadly available system is not undercut by the other exemptions in

the ACA, such as the exemptions for religious employers, small employers, and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions. *See, e.g.*, *Lee*, 455 U.S. at 261. In any event, the exemptions to the ACA are limited and the rationales that support them do not extend to exempting Plaintiffs. Currently, only religious employers' plans and grandfathered health plans (employer health plans that existed prior to March 23, 2010, and that have not made particular changes after that date) are not required to include coverage for preventive services. 42 U.S.C. § 18011(a), (e). Religious employers are exempt from the contraceptive coverage provision because the government reasonably assumed that if the church opposed contraception, the church's employees would, too. *See* 77 Fed. Reg. at 8,728. The exception for grandfathered plans sought to limit disruption by enabling individuals temporarily to maintain their health care coverage as it existed prior to enactment of the ACA. That exception is a transitional measure and will be eliminated as employers make changes to their health care plans. *See* 45 C.F.R. § 147.140(g) (a health plan ceases to be a grandfathered plan when it eliminates benefits, increases cost-sharing requirements, or changes its employer-contribution terms). According to HHS estimates, 66 percent of small-employer plans and 45 percent of large-employer plans were expected to lose their grandfathered status by the end of 2013.[25]   75

---

[25] According to a 2013 study conducted by Kaiser Health News, the grandfathering is already quickly phasing down. Thirty-six percent of individuals who receive health care coverage through their employer in 2013 were enrolled in a grandfathered health plan, as compared to 48 percent in 2012 and 56 percent in 2011. *Employer Health Benefits: 2013 Annual Survey,* Kaiser Family Foundation and Health Research & Educational Trust, at 221, *available at*

Fed. Reg. 34,538, 34,552 (June 17, 2010). The exemption for small employers (those with fewer than 50 employees) is not an exemption from the contraceptive coverage requirement, but from the requirement to provide any health insurance to their employees. 26 U.S.C. § 4980H(c)(2). Employees who do not get insurance through their jobs because they work for exempt small employers are eligible to purchase it through the exchanges, where all listed plans are required to cover contraceptive services without cost sharing. None of the three exemptions is analogous to what the Plaintiffs here seek.

\* \* \*

The accommodation is the least restrictive method of ensuring that women continue to receive contraceptive coverage in a seamless manner while simultaneously relieving the eligible organizations of any obligation to provide such coverage. Because the government has used the least restrictive means possible to further its compelling interest, RFRA does not excuse Plaintiffs from their duty under the ACA either to provide the required contraceptive coverage or avail themselves of the offered accommodation to opt out of that requirement. The accommodation meets the twin aims of respecting religious freedom and ensuring that women continue to receive contraceptive coverage without administrative, financial, or logistical burdens. The regulations thus respond appropriately to RFRA's explicit demand for "sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(5).

---

http://kaiserhealthnews.files.wordpress.com/2013/11/8465-employer-health-benefits-20131.pdf.

## V. Constitutional Claims

Plaintiffs raise several constitutional challenges to the regulations. We address each in turn, concluding that the regulations do not violate any of the constitutional provisions identified by Plaintiffs.

## A. Free Exercise of Religion

Plaintiffs claim that the contraceptive coverage requirement violates the Free Exercise Clause of the First Amendment because it categorically exempts houses of worship from the contraceptive coverage requirement and temporarily relieves grandfathered plans from the requirement to cover any preventive services without cost sharing, while not similarly exempting Plaintiffs. The Free Exercise Clause embodies a "fundamental nonpersecution principle." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993). But it "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith*, 494 U.S. at 879 (internal quotation marks omitted). A Free Exercise Clause challenge, in contrast to a claim under RFRA, receives strict scrutiny only if the challenged law is either not neutral or not generally applicable. *See Lukumi Babalu*, 508 U.S. at 531. We have held that the regulations comply with RFRA; they readily satisfy the less stringent free exercise standard.

"Neutrality and general applicability are interrelated," but distinct. *Id.* A law is not neutral if it facially "refers to a religious practice without a secular meaning discernable from the language or context," or if "the object of a law is to infringe upon or restrict practices because of their religious

motivation." *Id.* at 533. A law is not generally applicable if, "in a selective manner," it "impose[s] burdens only on conduct motivated by religious belief." *Id.* at 543.

Plaintiffs do not contend that the challenged contraceptive coverage requirement is religiously non-neutral on its face, nor that it was enacted for an anti-religious purpose, but that the exemptions provided to houses of worship and grandfathered plans render the contraceptive coverage requirement non-neutral and not generally applicable. Those exemptions, however, do not impugn the contraceptive coverage requirement's neutrality and generality: it is both, in the relevant sense of not selectively targeting religious conduct, whether facially or intentionally, and broadly applying across religious and nonreligious groups alike. *See Mich. Catholic Conf.*, 755 F.3d at 394; *RCAW*, 2013 WL 6729515, at *27-31; *Priests for Life*, 7 F. Supp. 3d at 105-07.

The contraceptive coverage requirement is a religiously neutral part of a national effort to expand health coverage and make it more efficient and effective. The ACA's limited or temporary exemptions do not amount to the kind of pattern of exemptions from a facially neutral law that demonstrate that the law was motivated by a discriminatory purpose. *See supra* Section IV.B.2. The Florida prohibition on animal killing invalidated in *Lukumi Babalu*, by contrast, responded to the opening of a Santeria church, which practiced religious animal-sacrifice rituals. 508 U.S. at 524. The ordinance elaborated a putatively general prohibition on animal killings with specific disapproval of killing for "sacrifice" as part of "any type of ritual," while exempting as "necessary" killings for sport hunting, slaughtering animals to eat them, eradication of pests, and euthanasia—killings that were "no more necessary or humane" than the forbidden Santeria

sacrifices. *Id.* at 536-37. That exemption for so many non-religious types of animal killing helped to make clear that "suppression of the central element of the Santeria worship service was the object of the ordinances." *Id.* at 534. The exemptions in the ACA do not single out any religion and are wholly consistent with the law's neutral purpose. Indeed, the existence of an exemption for religious employers substantially undermines contentions that government is hostile toward such employers' religion.[26]

The contraceptive coverage requirement also does not target religious organizations, but applies across the board. The exemptions do not render the law so under-inclusive as to belie the government's interest in protecting public health and promoting women's well-being or to suggest that disfavoring Catholic or other pro-life employers was its objective. *See RCAW*, 2013 WL 6729515, at *30. For example, the Supreme Court has held that, despite statutory exemptions for self-employed Amish employers, the social security system was "uniformly applicable to all." *United States v. Lee*, 455 U.S. 252, 260-61 (1982); *see also id.* at 262 (Stevens, J., concurring in the judgment) (describing the challenged law as "a valid tax law that is entirely neutral in its general application"). As the Sixth Circuit recently explained: "General applicability does not mean absolute universality."

---

[26] *See, e.g.*, *RCAW*, 2013 WL 6729515, at *28 (availability of the religious employer exemption "cuts against the conclusion that the contraceptive mandate was specifically designed to oppress those of the Catholic faith as plaintiffs suggest"); *Catholic Diocese of Nashville v. Sebelius*, No. 3:13-01303, 2013 WL 6834375, at *6 (M.D. Tenn. Dec. 26, 2013) (noting that exemption for religious employers and accommodation for eligible organizations "evidences an intent, not to burden Plaintiffs' religious beliefs, but to recognize and respect them").

*Mich. Catholic Conf.*, 755 F.3d at 394 (internal quotation marks omitted).

Plaintiffs contend that the ACA's exemptions make it under-inclusive in a way that suggests that the government believes that "secular motivations [for providing an exemption] are more important than religious motivations," Pls.' Br. 50 (internal quotation marks omitted), evidencing that the government "devalues religious reasons," Pls.' R. Br. 25 (internal quotation marks omitted). But, for the same reasons the exemptions do not undermine the government's interest in a uniform system, *see supra* Section IV.B.2, the exemptions do not demonstrate the government's hostility toward religious concerns.

Because the contraceptive coverage requirement is a neutral law of general applicability, Plaintiffs' free exercise claim fails.

## B. Expressive Association

The *Priests for Life* Plaintiffs argue that the contraceptive coverage requirement violates their First Amendment rights to expressive association, which protects the "right to associate for the purpose of speaking." *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* (*FAIR*), 547 U.S. 47, 68 (2006). The regulations infringe that right, the *Priests for Life* Plaintiffs contend, by requiring them to promote the government's immoral objective of expanding access to contraceptives, which undermines the organization's "very reason for its existence." Pls.' Br. 51. The *Priests for Life* Plaintiffs base their expressive association claim, like their RFRA claim, on a misreading of what the regulations require of them, suggesting that the regulations require them

to disclose the identities of their employees and plan beneficiaries. *See, e.g.*, Pls.' Br. 52-53. They do not.

A law may violate the First Amendment right to expressive association where it directly interferes with an expressive association's membership decisions or where it indirectly affects the group's composition by making membership less attractive. *FAIR*, 547 U.S. at 69. In *FAIR*, the Supreme Court held that a law requiring law schools receiving federal funds to give military recruiters access to the schools' facilities equal to the access it afforded other recruiting employers did not violate the objecting schools' rights to associate. *Id.* at 69-70. The law schools' non-discrimination policies prohibited discrimination based on sexual orientation, and, because the United States Military refused at that time to hire any openly gay or lesbian applicants, the law schools were strongly opposed to hosting military recruiters and actively facilitating their access to the schools' students. The Court rejected that claim, holding that the military recruiters' presence on campus "does not violate a law school's right to associate, regardless of how repugnant the law school considers the recruiter's message." *Id.* at 70. The Court acknowledged that the plaintiffs there had to "'associate' with military recruiters in the sense that they interact with them," but held that, because the recruiters were as an institutional matter outsiders who would "come onto campus for the limited purpose of trying to hire students," they did not impinge on the schools' expressive association. *Id.* at 69.

The same is true here: the *Priests for Life* Plaintiffs object to interacting with coverage providers that must make contraceptive coverage available, but such interaction does not make those providers part of the organization's expressive association or otherwise impair its ability to express its

message. Just as the students and faculty in *FAIR* remained "free to associate to voice their disapproval of" the military's policy against gays or lesbians serving openly in the military, *id.* at 69-70, Priests for Life's members and employees remain free to associate with each other to promote their religious views on contraception and other matters, and to voice their disapproval of health-care products and services that they believe to be immoral. "Nothing in the[] final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." 78 Fed. Reg. at 39,880 n.41. Accordingly, the *Priests for Life* Plaintiffs' expressive association claim fails.

## C. Compelled Speech

It is "a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) (internal quotation marks omitted); *see Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2282 (2012) ("The government may not . . . compel the endorsement of ideas that it approves."). Plaintiffs contend that the regulations impermissibly compel their speech in three ways.

First, Plaintiffs claim that the regulations require them to authorize and facilitate health care coverage for counseling that encourages and promotes contraception, in violation of their right against compelled speech. Plaintiffs appear to contend that the regulations commandeer them to echo or facilitate the words of medical professionals who might communicate to insured women the availability and potential appropriateness of various contraceptive methods. But the regulations do not require Plaintiffs to communicate any pro-contraceptive-coverage message, nor to authorize or facilitate

counseling in favor of contraception. *See supra* Section IV.A.2; *Mich. Catholic Conf.*, 755 F.3d at 391. They leave Plaintiffs free to voice their opposition to contraception.

Plaintiffs' reliance on *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011), is misplaced. *Arizona Free Enterprise Club* concerned a state campaign finance law under which candidates for state office who accepted public funding could receive additional state funds in the event that privately financed candidates and independent expenditure groups exceeded spending limits. *See id.* at 2813. Under Arizona's law, the volume of political expenditures by or in support of a privately financed candidate triggered funding to his or her opponent. *See id.* at 2818-19. Plaintiffs' completion of the self-certification form has no similar triggering role, and there is no interest or effect here to level competing voices, which was a significant aspect of the constitutional infirmity of Arizona's campaign finance law. *See id.* at 2825. Furthermore, contrary to Plaintiffs' argument, nothing in *Arizona Free Enterprise Club* suggests that the prohibition on compelling a party to "help disseminate hostile views" the party opposes, *id.* at 2821 n.8 (internal quotation marks omitted), applies to laws that require a party to engage in non-expressive behavior, such as the provision of health insurance.

Second, Plaintiffs argue that completing the self-certification form requires them to express a particular view, namely, that they oppose providing their plan participants with coverage for contraceptive services, and that it deprives them of the freedom to speak on this issue on their own

terms.[27] The self-certification form and alternative notice are the methods through which Plaintiffs can opt out of the requirement to provide their employees with health insurance coverage for contraceptive services. The filing of the form, though it may include "elements of speech," is "a far cry from the compelled speech" that the Supreme Court previously has found to be unconstitutional. *FAIR*, 547 U.S. at 61-62 (citing *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943), and *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). Just as the compelled speech that the law schools identified in *FAIR* was "plainly incidental to the Solomon Amendment's regulation of conduct," *id.* at 62, any speech required by the self-certification or alternative notice is similarly incidental to the accommodation's regulation of conduct. Compelling an organization to send a form to a third party to claim eligibility for an exemption "is simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die,' and it trivializes the freedom protected in *Barnette* and *Wooley* to suggest that it is." *Id.* Requiring Plaintiffs to give notice that they wish to opt out of the contraceptive coverage requirement no more compels their speech in violation of the First Amendment than does demanding that a conscientious objector self-identify as such.

The regulations do nothing to deprive Plaintiffs of "the freedom to speak on the issue of abortion and contraception on their own terms, at a time and place of their own choosing." Pls.' Br. at 55. Completing the self-certification form does not limit what Plaintiffs may say about contraception—or any other topic—nor does it limit where,

---

[27] Plaintiffs' briefing contends only that their speech is impermissibly compelled by the self-certification form, and does not address their compelled speech claim to the alternative notice.

when, or how they may say it. *See Mich. Catholic Conf.*, 755 F.3d at 392. Indeed, unlike the law schools in *FAIR* that had to host military recruiters and thus might have mistakenly been viewed as endorsing the military's discriminatory recruitment approach, the opt out here is designed to ensure that Plaintiffs do not have to express, in words or symbolic backing, any support for contraception. *Cf. FAIR*, 547 U.S. at 64-65 (government is limited in its "ability to force one speaker to host or accommodate another speaker's message" where accommodating that message interferes with the plaintiff's desired message).

Finally, Plaintiffs object to the regulations because they require that Plaintiffs' plan participants receive notice of the availability of payments for contraceptive services. Thus, according to Plaintiffs, the regulations coerce them to provide access to their plan participants and either create the appearance that Plaintiffs agree with the notification or call on them to respond to the notice to inform participants of Plaintiffs' objections to contraception.

But the regulations actually require quite the contrary: the plan issuer or TPA must send a message explicitly distancing the employer from the offered contraceptive coverage, and do so in a completely separate mailing from any communication regarding the employer-sponsored plan. 45 C.F.R. § 147.131(d) (insured group health plans); 29 C.F.R. § 2590.715-2713A(d) (self-insured plans). The regulations, therefore, take care to inform plan participants that the coverage for contraceptives is not paid for,

administered by, or connected to Plaintiffs. That is a long way from unconstitutionally compelling Plaintiffs to speak.[28]

## D. Establishment of Religion

Plaintiffs advance two Establishment Clause claims. They first contend that the regulations impermissibly discriminate between types of religious institutions by making a general distinction, familiar in tax law, between churches and other houses of worship (which are automatically exempt), and nonprofit organizations that may have a religious character or affiliation, such as universities and hospitals (which may use the accommodation to opt out). 26 U.S.C. § 6033(a)(3)(A)(i), (iii) (exempting "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any

---

[28] The *RCAW* Plaintiffs challenged the regulations' "non-interference" provision as an unconstitutional speech restriction, but as that provision has been rescinded, their challenge is moot. The provision originally barred self-insured employers from "directly or indirectly, seek[ing] to influence the [TPA's] decision" to provide or arrange separate payments for contraceptive services. 79 Fed. Reg. at 51,095. The government interpreted that bar as applicable only to the use of bribery, threats, or coercion to dissuade or hinder a TPA from fulfilling its legal obligation to provide contraceptive coverage. *Id.* The government has now rescinded the non-interference provision in its entirety. *Id.* Plaintiffs maintain that they still challenge the non-interference provision "to the extent the Government contends it continues to be unlawful to 'say to the[ir] TPA, if you don't stop making the payments for contraceptives, we're going to fire you.'" Pls.' Supp'l Br. 27 n.12 (internal brackets omitted). As the government asserted at oral argument, however, even when the non-interference provision was in effect, Plaintiffs were free to fire their insurers or TPAs as they wished. Oral. Arg. Tr. at 46:15-48:1.

religious order" from an annual return filing requirement). Second, they contend that the regulations entail excessive entanglement between the government and religious institutions. Specifically, to the extent that the regulations seek to be more nuanced and context specific, looking at specific attributes of each organization in an effort accurately to distinguish among them, Plaintiffs contend the government impermissibly interferes with internal church governance.

The regulations draw a long-recognized and permissible distinction between houses of worship and religious nonprofits. The Seventh Circuit, in rejecting a similar challenge to the contraceptive coverage regulations, noted that "religious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other entities, without these advantages being thought to violate the establishment clause." *Notre Dame*, 743 F.3d at 560 (internal citation omitted). The churches gained the categorical exemption on the assumption that the relatively small numbers of employees who are employed by a church will, if their church's mission opposes contraception, be ministers or clerics likely to share that view, or at least have knowingly joined a pervasively sectarian institution that expects them to. 77 Fed. Reg. at 8,728. The categorical exemption was not extended to the broader group of religious nonprofits, however, because religiously affiliated hospitals, universities and social service agencies employ a wide range of people of diverse faiths and are thus "more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives." *Id.* Limiting the exemption, but making the opt out available, limits the burdens that flow from organizations "subject[ing] their employees to the religious views of the employer." *Id.*

Plaintiffs equate the familiar regulatory distinction between houses of worship and religiously affiliated organizations, based on organizational form and purpose, with constitutionally impermissible distinctions based on denomination. They quote *Larson v. Valente*, 456 U.S. 228, 231-32, 246 n.23 (1982) and *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008), for the notion that the Establishment Clause forbids distinguishing between "types of institutions" as surely as between "sects or denominations." Pls.' Br. 57-58 (internal quotation marks omitted). Both of the cases Plaintiffs rely on, however, were concerned with lines drawn based on denomination, rather than organizational form or purpose.[29] In *Larson*, the Supreme Court invalidated a state law that imposed special registration requirements on churches that received a majority of their donations from non-members because it facially discriminated against religious denominations that were newer or chose to rely on public solicitation rather than financial support from members. 456 U.S. at 246-48. The distinction invalidated in *Colorado Christian* authorized public scholarships for students at Methodist and Roman Catholic universities while refusing them to students attending non-denominational evangelical Protestant or Buddhist universities. *See* 534 F.3d at 1258. The *Colorado Christian* court contrasted that denominational discrimination with the permissible exclusion "of all devotional theology majors equally." *Id.* at 1256 (citing *Locke v. Davey*, 540 U.S. 712, 715-16 (2004)). This Court in *University of Great Falls v. NLRB*, 278 F.3d 1335, 1343 (D.C. Cir. 2002), similarly

---

[29] Indeed, the Plaintiffs' argument would call into question the tax advantages that have long been available to houses of worship, but not other types of religious organizations. Those tax advantages have not been thought to violate the Establishment Clause. *See Notre Dame*, 743 F.3d at 560.

invalidated a regulatory line that effectively asked whether certain schools were "*sufficiently* religious" to be exempt from NLRB jurisdiction, administration of which line had drawn the government into questioning whether the university "was legitimately 'Catholic.'" *Id*. *University of Great Falls* favors a test relying on more objective factors about the institution's structure and activities. *Id*. The regulations at issue here draw distinctions based on organizational form and purpose, and not religious belief or denomination, in keeping with *Larson, Colorado Christian*, and *University of Great Falls*. *See also Mich. Catholic Conf.*, 755 F.3d at 395; *Notre Dame*, 743 F.3d at 560.

Additionally, Plaintiffs assert that the regulations violate the Establishment Clause because they believe they call on the government impermissibly to "'troll[] through a person's or institution's religious beliefs.'" Pls.' Br. 60 (quoting *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion)). The regulations define a "religious employer" as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a); *see also* 78 Fed. Reg. at 8,461 (stating that the exemption is restricted primarily to "churches, synagogues, mosques, and other houses of worship, and religious orders"). The IRS has developed a non-exhaustive, non-binding list of fourteen factors to consider when determining whether an entity is in fact a religious employer. *See Am. Guidance Found., Inc. v. United States*, 490 F. Supp. 304, 306 n.2 (D.D.C. 1980); *Found. of Human Understanding v. United States*, 88 Fed. Cl. 203, 220 (2009).

Plaintiffs contend that, in order to determine whether an entity is in fact a religious employer, the government asks intrusive questions about its religious beliefs in violation of

the Establishment Clause. They complain that the IRS factors "favor some types of religious groups over others" and that "they do so on the basis of intrusive judgments regarding beliefs, practices, and organizational structures." Pls.' Br. at 61. It is undisputed in this case that the Archdiocese is a religious employer, and no other Plaintiff contends that it was improperly denied religious-employer treatment. As a result, Plaintiffs do not challenge a determination that has been made using those factors, nor can they argue that the factors were impermissibly applied to them. Therefore, we agree with the district court that this challenge is not ripe for review. *RCAW*, 2013 WL 6729515 at *43-44.

### E. Internal Church Governance

Relying on *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694 (2012), the *RCAW* Plaintiffs allege that the regulations violate the Religion Clauses of the First Amendment by impermissibly interfering with matters of internal church governance. They claim that the regulations "artificially split[]" the Catholic Church in two—into the Archdiocese (an exempt religious employer) and its related nonprofit organizations—and prevent the Archdiocese from "ensur[ing] that these organizations offer health plans consistent with Catholic beliefs." Pls.' Br. at 63-64. Neither *Hosanna-Tabor*, nor any other precedent interpreting either of the Constitution's Religion Clauses, supports this novel claim.

The ACA's regulations do not address religious governance at all. The regulations' separate treatment of functions that Plaintiffs might prefer to group together does not interfere with how the Plaintiffs govern themselves internally. Plaintiffs invoke *Hosanna-Tabor*, but that case does not stand for Plaintiffs' proposition that the First

Amendment precludes application of a law simply because it may affect different types of religious institution differently.

In *Hosanna-Tabor*, the Supreme Court recognized a "ministerial exception, grounded in the First Amendment, that precludes application of [Title VII and other employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." 132 S. Ct. at 705 (internal quotation marks omitted); *see id.* at 710. The Court expressly limited its holding to "an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Id.* The language from *Hosanna-Tabor* that plaintiffs invoke, used there in the context of disapproving judicial review of ministers' discrimination claims because it would interfere "with an internal church decision that affects the faith and mission of the church itself," *id.* at 707, does not apply here. Unlike in that case, nothing about the regulation challenged here would "depriv[e] the church of control over the selection of those who [would] personify its beliefs"—the Church's own ministers. *Id.* at 706. The Court's reasoning in *Hosanna-Tabor* does not extend beyond ecclesiastical employment matters to regulations that may affect a church's decision about its health care plan. Accordingly, the church-governance claim must fail.

## F. Equal Protection

The *Priests for Life* Plaintiffs argue that the regulations violate equal protection as guaranteed by the Fifth Amendment, by discriminating on the basis of religion and impinging on their fundamental rights. This claim is largely duplicative of Plaintiffs' Establishment Clause challenge and fails for similar reasons. The *Priests for Life* Plaintiffs cite no case in support of their contention that alleged discrimination

between types of religious organizations within a denomination gives rise to an equal protection claim. Additionally, as the district court observed, the *Priests for Life* Plaintiffs' fundamental rights claim is identical to their other First Amendment claims. *Priests for Life*, 7 F. Supp. 3d at 110. Because we have rejected those claims, we apply rational basis scrutiny to the regulations. *See Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) (applying rational-basis scrutiny to an Equal Protection Clause claim alleging discrimination based on religion where the plaintiffs' Free Exercise Clause challenge failed). Because, as discussed *supra* Section IV.B, the regulations survive strict scrutiny, they necessarily survive this more limited form of review.

## VI. Administrative Procedure Act

The *RCAW* Plaintiffs contend that the government violated the Administrative Procedure Act by erroneously interpreting the exemption to apply on an employer-by-employer basis, rather than a plan-by-plan basis. The regulations state that the HRSA "may establish an exemption from [the regulations] with respect to a group health plan established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines." 45 C.F.R. § 147.131(a). With respect to "multiple employer plans"—plans established or maintained by an exempt religious employer as well as non-exempt organizations—the Departments concluded that "the availability of the exemption or an accommodation [will] be determined on an employer-by-employer basis." 78 Fed. Reg. at 39,886. This means that "each employer [is] required to independently meet the definition of religious employer or

eligible organization in order to avail itself of the exemption or an accommodation." *Id.*

An agency's interpretation of its own regulation is entitled to substantial deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The *RCAW* Plaintiffs contend that such deference is not appropriate here, however, for two reasons. First, they argue that, contrary to the government's contention, the regulation unambiguously states that the exemption applies on a plan-by-plan basis. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous."). The regulation, however, is silent as to whether the exemption will apply on an employer-by-employer basis or a plan-by-plan basis. It uses the phrase "group health plan," because the contraceptive-coverage requirement applies to group health plans (as opposed to employers), not because the regulatory unit for purposes of the exemption is the plan rather than the employer. Because the regulation does not speak to that issue, we reject the *RCAW* Plaintiffs' claim that the Departments' interpretation is not entitled to deference.

Second, the *RCAW* Plaintiffs assert that deference to the Departments' interpretation is not warranted because it conflicts with a prior interpretation put forth by the government. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) ("[D]eference is likewise unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.' This might occur when the agency's interpretation conflicts with a prior interpretation . . . ." (internal citations omitted)). But the Departments have not changed their position. When they issued the Notice of Proposed Rulemaking regarding

"Coverage of Certain Preventive Services Under the Affordable Care Act," the Departments made clear that they intended the exemption to apply on an employer-by-employer basis. *See* 78 Fed. Reg. at 8,467. ("The Departments propose to make the accommodation or the religious employer exemption available on an employer-by-employer basis. That is, each employer would have to independently meet the definition of eligible organization or religious employer in order to take advantage of the accommodation or the religious employer exemption with respect to its employees and their covered dependents."). The language on which the *RCAW* Plaintiffs rely to demonstrate that the Departments have changed their position does not support their argument. *See* 77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012). All they point to is a hypothetical that specifies that an exempt religious school is categorically exempt from the contraceptive coverage requirement, whether it establishes and maintains its own plan or offers its employees coverage through a plan established by the exempt religious diocese with which it is affiliated. *See id.* Thus, contrary to the *RCAW* Plaintiffs' contention, the Departments' interpretation that the exemption applies on an employer-by-employer basis does not conflict with its earlier interpretation of the regulation, and is entitled to *Auer* deference.

Finally, in their supplemental brief, Plaintiffs contend that the government lacked the "good cause" required to promulgate the interim final rule without notice and comment. *See* 5 U.S.C. § 553(b)(3)(B) (authorizing promulgation of interim final rules without notice and comment when the agency finds on the record "that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."). Several reasons support HHS's decision not to engage in notice and comment here. First, the agency made a good cause finding in the rule it

issued. *See* 79 Fed. Reg. at 51,095-96. Second, the regulations the interim final rule modifies were recently enacted pursuant to notice and comment rulemaking, and presented virtually identical issues; moreover, HHS will expose its interim rule to notice and comment before its permanent implementation. *See* 5 U.S.C. § 553(b)(3)(B) (good cause exists when "notice and public procedure . . . are . . . unnecessary"). Third, the modifications made in the interim final regulations are minor, meant only to "augment current regulations in light of the Supreme Court's interim order in connection with an application for an injunction in *Wheaton College*." 79 Fed. Reg. at 51,092; *see also Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) ("We have . . . indicated that the less expansive the interim rule, the less the need for public comment."). The government reasonably interpreted the Supreme Court's order in *Wheaton College* as obligating it to take action to further alleviate any burden on the religious liberty of objecting religious organizations. *See* 79 Fed. Reg. at 51,095-96; *see also Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1155-57 (D.C. Cir. 1981) (validating promulgation of interim rule without notice and comment because, *inter alia*, it would comply with a court order). As the agency explained, delay in implementation of the rule would interfere with the prompt availability of contraceptive coverage and delay the implementation of the alternative opt-out for religious objectors. *See* 5 U.S.C. § 553(b)(3)(B) (good cause exists when "notice and public procedure . . . are . . . contrary to the public interest").

* * *

In sum, we reject all of Plaintiffs' challenges to the regulations. Accordingly, we affirm the district court's opinion in *Priests for Life* in its entirety. As to the *RCAW*

decision, we vacate the district court's grant of summary judgment for Thomas Aquinas and its holding as to the unconstitutionality of the non-interference provision, and affirm the remainder of the decision.

*So ordered.*